JET SPRAY COOLER, INC. & another *vs.* GIFFORD K. CRAMPTON & others.

Middlesex. October 5, 1978. — January 26, 1979.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Trade Secret. Unfair Competition. Practice, Civil,* Master. *Damages,* Wrongful use of trade secret. *Interest.*

In an action involving the misappropriation of trade secrets, a master erred in concentrating on the lack of novelty of the process in his assessment of damages and in failing to focus instead on the abuse of the confidential relationship by the defendants. [163-169]

The measure of damages in a case involving the misappropriation of trade secrets entitled the plaintiffs to recover full compensation for their lost profits and required the defendants to surrender the profits which they realized from their tortious conduct; the value of the misappropriated trade secret to the defendants was not the basis of the defendants' liability and should not have formed the basis of the plaintiffs' recovery. [169-173] KAPLAN, J., concurring.

In an action for misappropriation of trade secrets, the judge did not err in his assessment of damages in allowing as a deduction from the defendants' gross profits all bad debts incurred by the defendants on sales of the infringing products. [177]

In an action for misappropriation of trade secrets, the judge did not err in his assessment of damages in allowing the defendants to deduct from their gross profits all salaries and consultant's fees paid to the individual defendants by the corporate defendant where the salaries and fees paid to the individual defendants were reasonable in light of their positions in the corporation. [178-179]

Where the plaintiffs in an action for misappropriation of trade secrets never marketed a product incorporating the misappropriated information, the plaintiffs failed to prove that their lost profits were the result of the defendants' sales to the plaintiffs' customers with sufficient certainty to allow the plaintiffs to recover damages based on lost profits. [179-181]

In an action for misappropriation of trade secrets, the joint involvement of the corporate defendant and the individual defendants in

actively utilizing the secrets required that the damages be assessed against all of them. [181]

Where an award of damages fully compensated the plaintiffs in an action for misappropriation of trade secrets, the judge properly awarded interest only from the date the master's report was filed in accordance with G. L. c. 235, § 8. [181]

BILL IN EQUITY filed in the Superior Court on August 14, 1964.

Following review by this court reported at 361 Mass. 835 (1972) the suit was heard on the issue of damages by *Dimond*, J. The Supreme Judicial Court granted a request for direct appellate review.

*Albert P. Zabin (Anne W. Yates* with him) for the defendants.

*Morris Michelson (Anne Hyde & Joseph T. Fahy* with him) for the plaintiffs.

ABRAMS, J. Both the plaintiffs and the defendants appeal from a judgment of the Superior Court adopting as modified the report of a master on the issue of damages.[1] The judgment held the defendants jointly and severally liable to the plaintiffs in the amount of $282,100.83, plus interest from the date of the filing of the master's report.

The defendants appeal from the rejection of an earlier master's report (first damage master), and argue that the judge's order of reference to another master (second damage master) was based on incorrect legal principles of damage assessment in cases involving the misappropriation of trade secrets. They also appeal from certain of the judge's modifications of the second master's report.

The plaintiffs maintain that the rejection of the first damage master's report was proper, and contend that the judge's order of reference to the second damage master for the determination of damages was correct. Nevertheless, the plaintiffs also appeal from certain of the judge's modifications of the second damage master's report and

---

[1] The issue of liability was resolved by this court in *Jet Spray Cooler, Inc.* v. *Crampton,* 361 Mass. 835 (1972).

from the judge's method of computing interest on the award. We agree in substance with the judgment entered. However, the judgment must be modified to correct errors arising from the transposition of certain accounting figures. As recomputed, the damages assessed should be $254,114.79. See note 16, *infra*. As so modified, we affirm the judgment of the Superior Court.

This action commenced with a bill of complaint in equity filed in the Superior Court in 1964. Three years later, the Superior Court judge severed the issues of liability and damages and committed the case to a master (liability master).

After initially confirming the report of the liability master which found that the defendants had misappropriated certain trade secrets belonging to the plaintiffs, the Superior Court judge ordered the bill dismissed as to all defendants. We reversed the dismissal in *Jet Spray Cooler, Inc.* v. *Crampton*, 361 Mass. 835, 845 (1972).[2]

Thereafter, the Superior Court judge referred the issue of damages to the first damage master in *1972*.[3] The master held hearings and filed his report in *1975*, including both subsidiary and general findings of fact.[4]

---

[2] Details as to the facts of the case as they relate to liability are found in our original opinion. *Jet Spray Cooler, Inc.* v. *Crampton, supra* at 836-838. We do not repeat them here.

[3] This case was committed to the first damage master prior to the effective date of the Massachusetts Rules of Civil Procedure. However, this fact does not alter the result in this case. See *Jones* v. *Wayland*, 374 Mass. 249, 255 n. 5 (1978); Reporters' Notes to Mass. R. Civ. P. 53, reprinted in J. W. Smith & H. B. Zobel, Rules Practice 270, 272 (1977).

[4] The first damage master also included with his report a transcript of the evidence and proceedings and the exhibits. The order of reference to the first damage master did not authorize him to report the evidence. Nearly three years later, after the hearings had concluded, the order of reference was amended by consent of the parties to require the master to submit a transcript of the evidence and the proceedings. The same motion allowed the master additional time in which to prepare his report.

It is generally inappropriate to amend the order of reference to require a transcript of the evidence and the proceedings after the

Hearings on the claim for damages began in January, 1973. The hearings were then suspended until February. The docket entries reflect continuance of the order resuming the hearings until March, *1973*. The next docket entry relating to the hearings is a motion to enlarge time for filing the master's report filed on April 15, *1975*. The report itself was not filed in court until July 24, 1975, more than three years after our opinion in *Jet Spray Cooler, Inc.* v. *Crampton*, and two and one-half years after the order of reference.

Hearings before the second damage master were to begin in January, 1976. The docket entries reflect at least five continuances of the master's hearings covering a six-month period. Then there were continuances to enlarge the time for filing the master's report. The report was filed on April 20, 1977, some four years and eleven months after our 1972 opinion, and well over one and one-half years after the second order of reference.

---

hearings before the master have terminated. Cf. *American Agricultural Chem. Co. of Mass.* v. *Robertson*, 273 Mass. 66, 80 (1930). It is clearly inappropriate to order a report of the evidence to assist parties who have delayed proceedings by continuances.

Massachusetts Rule of Civil Procedure 53(e)(1), as amended, 367 Mass. 917 (1975), provides that the master is to file a transcript of the evidence and the proceedings only "when directed by the order of reference." This rule, like its predecessor Rules 86-90 of the Superior Court, "was carefully guarded to avoid the evils of delay, prolixity and unnecessary expense which are often associated with reports of evidence." *Morin* v. *Clark*, 296 Mass. 479, 483 (1937). To accomplish this result, Mass. R. Civ. P. 53(e)(1) pointedly does not adopt the prevailing Federal rule. Compare Fed. R. Civ. P. 53(e)(1) (1977). "This deviation in the language of the Massachusetts rule from that of the Federal rule on which it was based reflects the traditional practice in our courts (unlike the practice of the Federal courts) that a master is rarely ordered to report the evidence heard by him." *Michelson* v. *Aronson*, 4 Mass. App. Ct. 182, 185 (1976).

Massachusetts Rule of Civil Procedure 53(e)(1) allows the judge in his discretion to order a report of the evidence. However, this discretion should infrequently be exercised. See *Peters* v. *Wallach*, 366 Mass. 622, 626 (1975); *Shelburne Shirt Co.* v. *Singer*, 322 Mass. 262, 265 (1948). See generally J. W. Smith & H. B. Zobel, Rules Practice § 53.9 (1977).

This case has been pending in the Superior Court since 1964 and has been before three masters. It has been continued indiscriminately by numerous judges, apparently without regard to the effect excessive continuances and extensions have on court delay, as well as on the confidence of the public and litigants in the administration of justice.

The snail's pace of this litigation in our courts makes the comment of Chief Justice Vanderbilt with regard to the effect of references appropriate here. In his work, Cases and Materials on Modern Procedure and Judicial Administration (1952), he states: "There is one special cause of delay in getting cases on for trial that must be singled out for particular condemnation, the all-too-prevalent habit of sending matters to a reference. There is no more effective way of putting a case to sleep for an indefinite period than to permit it to go to a reference with a busy lawyer as referee. Only a drastic administrative rule,[5] rigidly enforced, strictly limiting the matters in which a reference may be had and requiring weekly reports as to the progress of each reference will put to rout this inveterate enemy of dispatch in the trial of cases." *Id.* at 1240-1241. See *O'Brien* v. *Dwight*, 363 Mass. 256, 279-280 (1973).

I. *The Rejection of the Report of the First Damage Master.*

The first damage master found that the defendants had incorporated information contained in the Foster-Miller report[6] into each of the visual display beverage dispensers

[5] See Rule 49 of the Superior Court (1974). It may also be desirable for a judge to require any request for continuance of a master's hearing to be signed by the litigants as well as by counsel. Further, it is appropriate for the motion to state in writing the reasons for granting a continuance, so that the public may know the reasons for delay.

[6] The information contained in the Foster-Miller report involves engineering improvements in the dome and cooling processes. We do not discuss these "improvements" in further detail since the plaintiffs claim that the report still remains a trade secret. See, e.g., *Black, Sivalls & Bryson, Inc.* v. *Keystone Steel Fabrication, Inc.*, 584 F.2d 946, 949 (10th Cir. 1978); *A.O. Smith Corp.* v. *Petroleum Iron Works Co.*, 73

which Crathco, the corporate defendant, sold after 1962. The first damage master also incorporated in his report the finding by the liability master "that it would ordinarily take a year for a competent engineer with the benefit of the Foster-Miller Associates Report to conceive, design and develop the Crathco dispenser, and about three months additional without the benefit of the information contained in the report."

However, the first damage master then found that taken as a whole the recommendations of the Foster-Miller report "involved no creativity, were not novel, new, unobvious or patentable, and were matters of common knowledge to a person of ordinary skill in the field of heat transfer." He further found that the only damage to the plaintiffs was the three-month head start gained by the defendants, which he characterized as having a "negligible" effect on the profits of either the plaintiffs or the defendants. Therefore, the first damage master concluded that the plaintiffs' damages should be limited to the $1,400 which the plaintiffs had originally paid for the Foster-Miller report.

The judge rejected the first damage master's report in its entirety. The defendants challenge the judge's ruling on the ground that the first damage master applied correct legal principles in his assessment of the plaintiffs' damages.[7] Moreover, the defendants contend that the

_____

F. 2d 531, 539 note (6th Cir. 1934), modified on other grounds, 74 F. 2d 934, 935 (6th Cir. 1935); *Macbeth-Evans Glass Co.* v. *Schnelbach,* 239 Pa. 76, 81 (1913). See generally Annot., 62 A.L.R.2d 509, 532 (1958). But see note 13, *infra* and the concurring opinion of Justice Kaplan.

[7] The defendants ground their argument that the judge improperly rejected the first damage master's report on the language of Mass. R. Civ. P. 53(e)(2), 365 Mass. 817 (1974). Rule 53(e)(2) provides in pertinent part that "[i]n an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous .... The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions."

However, the "clearly erroneous" standard of rule 53(e)(2) does not

first damage master's conclusions were legally correct in light of our opinion in *Jet Spray Cooler, Inc.* v. *Crampton, supra.* We disagree.

The essence of an action for the wrongful use of trade secrets is the breach of the duty not to disclose or to use without permission confidential information acquired from another. See *Junker* v. *Plummer,* 320 Mass. 76, 80 (1946); *E.I. duPont de Nemours Powder Co.* v. *Masland,* 244 U.S. 100, 102 (1917). See generally Restatement of Torts § 757 (1939); Developments in the Law — Competitive Torts, 77 Harv. L. Rev. 888, 948-949 (1964). In the context of an employer-employee relationship, we have consistently held that where an employee acquires such confidential information in the course of his employment, he may be prohibited, after the termination of his employment, "from using or disclosing confidential information so acquired." *Jet Spray Cooler, Inc.* v. *Crampton, supra* at 839, quoting from *New England Overall Co.* v. *Woltmann,* 343 Mass. 69, 75 (1961). See *Eastern Marble Prods. Corp.* v. *Roman Marble, Inc.,* 372 Mass. 835, 841-842 (1977). *Aronson* v. *Orlov,* 228 Mass. 1, 4-5, cert. denied, 245 U.S. 662 (1917).

relieve the judge of the obligation to ensure that the report of the master correctly interprets and applies controlling legal principles. *General Plywood Corp.* v. *Georgia-Pac. Corp.,* 362 F. Supp. 700, 704 (S. D. Ga. 1973), aff'd, 504 F. 2d 515 (5th Cir. 1974). *W. R. B. Corp.* v. *Geer,* 313 F. 2d 750, 753 (5th Cir. 1963), cert. denied, 379 U.S. 841 (1964). The judge must reject the master's report where the master's findings are "vitiated in view of the controlling law." *Wormstead* v. *Town Manager of Saugus,* 366 Mass. 659, 660 (1975), quoting from *Selectmen of Hatfield* v. *Garvey,* 362 Mass. 821, 825 (1973). See *Gil-Bern Constr. Corp.* v. *Medford,* 357 Mass. 620, 623 (1970). See generally J. W. Smith & H. B. Zobel, Rules Practice § 53.11 (1977); 9 C. A. Wright & A. R. Miller, Federal Practice and Procedure, § 2614, at 811 (1971) (findings of the master "infected by a legal error" cannot stand).

Furthermore, where it is impossible to separate the findings which are "infected by a legal error" from those which are not, the judge does not abuse his discretion by rejecting the entire master's report and recommitting the case with instructions. *Haverhill Gazette Co.* v. *Union Leader Corp.,* 333 F. 2d 798, 808 (1st Cir. 1964). See Mass. R. Civ. P. 53(e)(2).

The protection which we afford to trade secrets[8] against one who wrongfully uses them is grounded on principles

[8] In addition to the protection which we have afforded to trade secrets through civil actions for injunctive relief and damages, the Legislature has provided criminal penalties for the misappropriation of trade secrets.

General Laws c. 266, § 30(4), inserted by St. 1967, c. 817, § 1, provides that "[w]hoever steals, or with intent to defraud obtains by a false pretense, or whoever unlawfully, and with intent to steal or embezzle, converts, secretes, unlawfully takes, carries away, conceals or copies with intent to convert any trade secret of another, regardless of value, whether such trade secret is or is not in his possession at the time of such conversion or secreting, shall be guilty of larceny, and shall be punished by imprisonment in the state prison for not more than five years, or by a fine of not more than six hundred dollars and imprisonment in jail for not more than two years. The term 'trade secret' as used in this paragraph means and includes anything tangible which constitutes, represents, evidences or records a secret scientific, technical, merchandising, production, or management information, design, process, procedure, formula, invention or improvement."

General Laws c. 266, § 60A, inserted by St. 1967, c. 817, § 2, provides that "[w]hoever buys, receives, conceals, stores, barters, sells or disposes of any trade secret, or pledges or accepts as security for a loan any trade secret, regardless of value, knowing the same to have been stolen, unlawfully converted, or taken, shall be punished by imprisonment for not more than five years or by a fine of not more than five hundred dollars and imprisonment in jail for not more than two years. The term 'trade secret' as used in this section shall have the same meaning as is set forth in section thirty."

Moreover, the Legislature has provided a civil remedy in addition to the criminal penalties. General Laws c. 93, § 42, inserted by St. 1967, c. 817, § 3, provides that "[w]hoever embezzles, steals or unlawfully takes, carries away, conceals, or copies, or by fraud or by deception obtains, from any person or corporation, with intent to convert to his own use, any trade secret, regardless of value, shall be liable in tort to such person or corporation for all damages resulting therefrom. Whether or not the case is tried by a jury, the court in its discretion, may increase the damages up to double the amount found. The term 'trade secret' as used in this section shall have the same meaning as is set forth in section thirty of chapter two hundred and sixty-six." See also G. L. c. 93, § 42A (injunctive relief).

General Laws c. 93, § 42, was enacted in 1967, three years after the original bill in equity in this action was filed. Neither party has raised the issue, and the judge did not increase the damages beyond "the amount found." Thus we do not decide whether this statute applies to this action. See, e.g., *Cudlassi* v. *MacFarland,* 304 Mass. 612, 613 (1939); *Wild* v. *Boston & Me. R.R.,* 171 Mass. 245, 248 (1898). Cf. *Porter*

of public policy to which we have adhered since *Peabody* v. *Norfolk*, 98 Mass. 452, 457 (1868): "It is the policy of the law, for the advantage of the public, to encourage and protect invention and commercial enterprise."[9] This encouragement and protection is afforded trade secrets because the public has a manifest interest not only in commercial innovation and development, but also in "[t]he maintenance of standards of commercial ethics." *Kewanee Oil Co.* v. *Bicron Corp.*, 416 U.S. 470, 481 (1974).

Early Federal decisions are remarkably similar. In *Fowle* v. *Park*, 131 U.S. 88, 97 (1889), the Supreme Court held that "[t]he policy of the law is to encourage useful discoveries by securing their fruits to those who make them." In *Board of Trade of Chicago* v. *Christie Grain & Stock Co.*, 198 U.S. 236, 250 (1905), Mr. Justice Holmes said that the board had "the right to keep the work which it has done, or paid for doing, to itself. The fact that others

v. *Clerk of the Superior Court*, 368 Mass. 116, 118 (1975). Nevertheless, the statute does provide guidance as to the view of the Legislature with regard to principles of damage assessment in cases involving business torts.

Furthermore, Mass. R. Civ. P. 26(c)(7), 365 Mass. 772 (1974), provides for the issuance of protective orders to avoid the disclosure of trade secrets given in the context of judicial proceedings, and G. L. c. 93A, § 6 (5), protects against the disclosure of trade secrets in the context of investigations by the Attorney General. *Matter of Civil Investigative Demand Addressed to Yankee Milk, Inc.*, 372 Mass. 353, 359-360 (1977). See also G. L. c. 4, § 7, Twenty-sixth (*g*).

[9] We have frequently indicated, however, that "[a] trade secret need not be a patentable invention." *J. T. Healy & Son* v. *James A. Murphy & Son*, 357 Mass. 728, 738 (1970). See generally Schneider & Halstrom, Trade Secret Protection in Massachusetts, 56 Mass. L. Q. 239, 243-246 (1971). In determining whether certain information qualifies as a trade secret, we consider "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Jet Spray Cooler, Inc.* v. *Crampton, supra* at 840. Restatement of Torts § 757, Comment b (1939).

might do similar work, if they might, does not authorize them to steal the plaintiff's." Again in *Dr. Miles Medical Co.* v. *John D. Park & Sons,* 220 U.S. 373, 402 (1911), the Court held that "[t]he complainant relies upon the ownership of its secret process and its rights are to be determined accordingly. Any one may use it who fairly, by analysis and experiment, discovers it. But the complainant is entitled to be protected against invasion of its right in the [secret] process by fraud or by breach of trust or contract." Further, in *E.I. duPont de Nemours Powder Co.* v. *Masland,* 244 U.S. 100, 102 (1917), the Supreme Court said that an employee "shall not fraudulently abuse the trust reposed in him." In *Becher* v. *Contoure Laboratories, Inc.,* 279 U.S. 388, 391 (1929), the Court recognized a cause of action against an employee for "breach of a contract or wrongful disregard of confidential relations." Finally, in *United States* v. *Dubilier Condenser Corp.,* 289 U.S. 178, 186 (1933), the Court held that an inventor "may keep his invention secret and reap its fruits indefinitely." See generally *Water Servs., Inc.* v. *Tesco Chems., Inc.,* 410 F.2d 163, 171 (5th Cir. 1969); Hutter, Trade Secret Misappropriation: A Lawyer's Practical Approach to the Case Law, 1 W. New England L. Rev. 1, 9 (1978).

Consistent with these principles, once information is demonstrated to be "of an appropriate nature to qualify" the information as a trade secret, any inquiry into the misuse of the trade secret must focus on the conduct of the defendant. *Jet Spray Cooler, Inc.* v. *Crampton, supra* at 843. If the defendant has acquired the information as a result of a confidential relationship which he enjoyed with the plaintiff, and, if the defendant has used the information without the permission of the plaintiff, then the defendant's use of the information is wrongful, and the defendant is liable to the plaintiff in damages "for the wrongful use of the information." *Id.* at 845.

The first damage master apparently did not focus on the facts found in the case on liability. The liability master found that "[s]ince their inception the plaintiffs have

conducted an extensive research and development program in a constant effort to improve their products and have, on occasion, consulted with independent engineering firms to help develop new products as well as to improve their existing products." *Jet Spray Cooler, Inc.* v. *Crampton, supra* at 836. Additionally, in *Jet Spray Cooler* the plaintiffs had maintained sufficient secrecy to protect the confidentiality of the information in the Foster-Miller report. *Id.* at 844.

The first damage master apparently attached no importance to either of these factors and concentrated on the lack of novelty rather than on the impropriety of the method used to procure the secret. The fact that a process is the combination and adaptation of old principles to new purposes does not prevent the process from being a trade secret if the process as distilled accomplishes a result which gives the holder a competitive advantage due to his own ingenuity, research and development. Moreover, "the fact that the secret was easy to duplicate does not militate against its being a trade secret. The important point is that the owner and those to whom it was necessary to reveal the secret knew of the trade secret." Maruchnics, Industrial Trade Secrets, Their Use and Protection, 4 Clev.-Mar. L. Rev. 69, 71-72 (1955). Thus, the first damage master erred as matter of law in failing to focus on the abuse of the confidential relationship and on the secrecy attached to the report which was designed to improve the plaintiffs' product and give it a competitive advantage. By not focusing on the defendants' conduct and on the secrecy attached to the Foster-Miller report, the first damage master erred in his assessment of damages.

The measure of damages in cases involving business torts such as the misappropriation of trade secrets entitles a plaintiff to recover full compensation for his lost profits and requires a defendant to surrender the profits which he realized from his tortious conduct. See, e.g., *National Merchandising Corp.* v. *Leyden*, 370 Mass. 425,

430-433 (1976) (interference with contractual relations); *Forster Mfg. Co.* v. *Cutter-Tower Co.*, 215 Mass. 136, 139-140 (1913) (misuse of trade name); *Regis* v. *H.A. Jaynes & Co.*, 191 Mass. 245, 249-250 (1906) (infringing trademark). See Restatement of Restitution § 136, Comment a (1937); Restatement of Torts § 757, Comment e (1939). "Public policy requires that unfair competitors must not be allowed to profit by their wrongful methods and that those who have been injured by them should receive adequate compensation for the loss or injury they have suffered." 2 H. Nims, Unfair Competition and Trade-Marks § 419, at 1324-1325 (4th ed. 1947).

Of course, a plaintiff is not entitled to both the profits made by the defendant and his own lost profits. See *Forster Mfg. Co.* v. *Cutter-Tower Co.*, *supra* at 139. See generally *Telex Corp.* v. *International Business Machs. Corp.*, 510 F. 2d 894, 931 (10th Cir.), cert. dismissed, 423 U.S. 802 (1975); Johnson, Remedies in Trade Secret Litigation, 72 Nw. U. L. Rev. 1004, 1023 (1978); Hutter, Trade Secret Misappropriation: A Lawyer's Practical Approach to the Case Law, 1 W. New England L. Rev. 1, 39 (1978); R.M. Milgrim, Trade Secrets § 7.08 [3] at 7-155 (1978).

However, while a plaintiff is not entitled to a double recovery, "the plaintiff is entitled to the profit he would have made had his secret not been unlawfully used, but not less than the monetary gain which the defendant reaped from his improper acts" (footnotes omitted). 2 R. Callman, Unfair Competition, Trademarks and Monopolies § 59.3, at 496 (3d ed. 1968). *Clark* v. *Bunker*, 453 F.2d 1006, 1011 (9th Cir. 1972). Cf. *Sperry Rand Corp.* v. *A-T-O, Inc.*, 447 F. 2d 1387, 1392-1393 (4th Cir. 1971), cert. denied, 409 U.S. 892 (1972). Only in this way can we ensure that an unfair competitor will not be encouraged to proceed with his unfair methods in the hope "that his profits might exceed the injured party's losses." *National Merchandising Corp.* v. *Leyden, supra* at 433. Therefore, a plaintiff in an action involving the misappropriation of trade secrets may proceed in the alternative to determine

whether the defendant's wrongful profits exceed the plaintiff's losses caused by the misuse of the plaintiff's trade secrets. See *id.* at 433-434 & n.16.

We now consider the first damage master's method of assessing damages in light of traditional principles. The first damage master found that "[t]he plaintiffs introduced detailed evidence in relation to the period from the inception of Crathco . . . concerning alleged profits made by the defendants year by year on sale of their units, and concerning alleged plaintiffs' loss year by year of profits on sales by the defendants to plaintiffs' customers to the extent that the plaintiffs' profits would have exceeded the profits made by the defendants thereon."[10] Nonetheless, the first damage master disregarded this information and refused to assess damages based on the defendants' profits or the plaintiffs' lost profits because he found that the only effect of the defendants' wrongful use of the Foster-Miller report was the fact that the defendants were able to enter the market in competition with the plaintiffs three months earlier than they could have done without the benefit of the information contained in the report.[11]

---

[10] The first damage master's subsidiary findings reveal that he found that the "royalty" value of the report did not exceed $1,400. In a case involving the misappropriation of trade secrets, we recognize that "the 'reasonable royalty' measure of damages is taken to mean more than simply a percentage of actual profits" and is based on "a reasonable estimate of value" of the misappropriated trade secrets. *University Computing Co.* v. *Lykes-Youngstown Corp.,* 504 F.2d 518, 537 (5th Cir. 1974). See *Structural Dynamics Research Corp.* v. *Engineering Mechanics Research Corp.,* 401 F. Supp. 1102, 1119 (E. D. Mich. 1975). However, the "reasonable royalty" measure of damages is only appropriate where the defendant has made no actual profits and the plaintiff is unable to prove a specific loss. See *University Computing Co.* v. *Lykes-Youngstown Corp., supra* at 536. See generally Johnson, Remedies in Trade Secret Litigation, 72 Nw. U. L. Rev. 1004, 1025-1026 (1978); Hutter, Trade Secret Misappropriation; A Lawyer's Practical Approach to the Case Law, 1 W. New England L. Rev. 1, 41-42 (1978).

[11] To the extent that the first damage master's findings with regard to the three-month period of time may be interpreted as applying a

But the *value* of the misappropriated trade secrets to the defendants is not the basis of the defendants' liability, and the value of the misappropriated trade secrets should not form the basis of the plaintiffs' recovery. See generally *National Merchandising Corp.* v. *Leyden, supra* at 430-433. Accord, G. L. c. 93, § 42. Therefore, by focusing on the value of the misappropriated trade secrets, and not on the wrongful conduct of the defendants, the first damage master's assessment of damages was legally incorrect. The judge properly rejected the master's report and committed the case to a second damage master. Cf. *Wormstead* v. *Town Manager of Saugus*, 366 Mass. 659, 660 (1975).

"head start rule" in assessing damages in this action, such a measure of damages is improper. The application of a "head start" approach would limit damages to that period of time in which "others in the trade are likely, through legitimate business procedures, to have become aware of these secrets." *Analogic Corp.* v. *Data Translation, Inc.*, 371 Mass. 634, 649 (1976).

Generally, the "head start rule" has been applied in cases where the plaintiff's product, including the trade secret, has been marketed. The marketing of the product gives competitors a legitimate opportunity to study the product and to learn the principles of the trade secret through reverse engineering or similar procedures. See, e.g., *Eastern Marble Prods. Corp.* v. *Roman Marble, Inc.*, 372 Mass. 835, 842-843 (1977); *Analogic Corp.* v. *Data Translation, Inc., supra* at 648-649. Cf. *Carboline Co.* v. *Jarboe*, 454 S.W.2d 540, 552-553 (Mo. 1970).

In a petition for injunctive relief, we have indicated that the time necessary to engineer in reverse is one factor to be considered in determining the propriety of the duration of injunctive relief. See *Eastern Marble Prods. Corp.* v. *Roman Marble, Inc., supra* at 842-843; *Analogic Corp.* v. *Data Translation, Inc., supra* at 648. We have not applied this theory in an action for damages. The defendants contend that the actual marketing by the plaintiffs of a product incorporating the trade secrets in question is irrelevant to the application of a head start rule. In support of their argument, the defendants rely on *National Rejectors, Inc.* v. *Trieman*, 409 S.W.2d 1 (Mo. 1966), and *Structural Dynamics Research Corp.* v. *Engineering Mechanics Research Corp.*, 401 F. Supp. 1102 (E. D. Mich. 1975). However, in *National Rejectors*, the Supreme Court of Missouri held that no trade secrets belonging to the plaintiffs had been misappropriated by the defendants. *Id.* at 34. In *Structural Dynamics*, not only was the remedy based on a "reasonable royalty" because the defendants had made no profits, *id.* at 1119, but also the plaintiffs had marketed products containing the trade secrets. *Id.* at 1109.

II. *The Report of the Second Damage Master.*

The judge's order of reference to the second damage master instructed the master: "(1) To find the extent of the use made by the defendants of the trade secret (Foster Miller Report); (2) To find the amount of profits made by the defendants on the sale of units incorporating the trade secret; and (3) To find the amount of the plaintiffs' loss of profits due to the defendants' sales of such dispensers to plaintiffs' customers to the extent such loss exceeds the defendants' profits on these same sales." This order of reference is consistent with our traditional principles of damage assessment in cases involving business torts.[12] The second damage master made specific findings with regard to each of the three issues which the judge had instructed him to examine.

First, the second damage master addressed the extent to which the trade secrets had been used by the defendants. He found that each visual display beverage dispenser unit sold by the corporate defendant from 1963 to September 30, 1975 (the accounting period) incorporated the trade secrets contained in the Foster-Miller report.[13] The second damage master also found that during the

_____

[12] The defendants object to certain findings of the second damage master concerning the question whether the misappropriated trade secrets themselves *caused* the defendants' profits. They allege that the findings exceeded the scope of reference to the master.

The order of reference to the second damage master adequately required a finding of causation. The master was directed to find whether the defendants' profits accrued from the sale of products incorporating the misappropriated trade secrets. See, e.g., *Eno* v. *Prime Mfg. Co.*, 314 Mass. 686, 695-696 (1943); *Adolph Gottscho, Inc.* v. *American Marking Corp.*, 26 N.J. 229, 240 (1958). The second damage master was also directed to find the amount of the plaintiffs' lost profits "due to" the defendants' sales of products utilizing the trade secrets.

[13] During oral argument, counsel for the plaintiffs suggested the possibility of a new action against the defendants which would claim damages beyond September 30, 1975, the end of the accounting period utilized by the second damage master. Of course, such a suggestion

accounting period the defendants sold 27,110 dispensers with gross sales of $6,322,357.18.

Second, the master computed the net profits of the defendants during the accounting period from sales incorporating the trade secrets. Since all the sales of the defendants incorporated the trade secrets, the second damage master computed the total net profits of the defendants.[14] He found that the records submitted by the

brings no issue before us and we do not decide whether the filing of a second action based on these facts is permissible.

It is clear that the information contained in the Foster-Miller report is now approximately twenty years old. The plaintiffs have never marketed a product incorporating the information. From the outset, the information, while appropriate to qualify it as a trade secret, seems to have been the type of development which "was the result of ordinary mechanical skill." *A. O. Smith Corp.* v. *Petroleum Iron Works Co.*, 73 F. 2d 531, 538 (6th Cir. 1934). Accord, Restatement of Torts § 757, Comment b (1939).

Therefore, in the event of any future litigation there must be a new evaluation of the information in the Foster-Miller report "to determine if the process truly remains a trade secret." *Eastern Marble Prods. Corp.* v. *Roman Marble, Inc.*, 372 Mass. 835, 843 (1977). See *Jet Spray Cooler, Inc.* v. *Crampton*, 361 Mass. at 840. See also note 9 *supra*, and the concurrence of Justice Kaplan.

[14] Once the plaintiffs demonstrate that the defendants have made profits from sales of products incorporating the misappropriated trade secrets, the burden shifts to the defendants to demonstrate the portion of their profits which is not attributable to the trade secrets. Cf. *Westinghouse Elec. & Mfg. Co.* v. *Wagner Elec. & Mfg. Co.*, 225 U.S. 604, 620 (1912); *Callaghan* v. *Myers*, 128 U.S. 617, 666 (1888); *Sheldon* v. *Metro-Goldwyn Pictures Corp.*, 106 F. 2d 45, 48 (2d Cir. 1939), aff'd, 309 U.S. 390 (1940). When an apportionment of the defendants' profits is not possible on the basis of the evidence, "[t]he fact that he may lose something of his own is a misfortune which he has brought upon himself . . . ." *Westinghouse Elec. & Mfg. Co.* v. *Wagner Elec. & Mfg. Co., supra* at 620. See generally Johnson, Remedies in Trade Secret Litigation, 72 Nw. U. L. Rev. 1004, 1018-1020 (1978).

The defendants apparently did not sustain this burden before the master, who found that "the testimony from certain of Jet's customers as [to] their reasons for buying from Crathco rather than Jet was not impressive and raised doubts in my mind as to the weight it was entitled to as respects credibility." Therefore, the award of damages based on Crathco's entire profits from sales of units incorporating the misappropriated trade secrets was proper.

corporate defendent showed total net profits of $67,604.80 during the accounting period.[15] He rejected a claim by the defendants that $15,422.20 in losses incurred during two of the years of the accounting period should be deducted from their total net profits. He also disallowed certain other deductions claimed by the defendants and added them to the defendants' net profits:

(a) $105,553.17 in legal fees and expenses in defending this action.

(b) $19,759.61 in Federal income taxes paid by the corporate defendant during the accounting period.

(c) $21,578.29 in Massachusetts excise taxes paid by the corporate defendant during the accounting period.

(d) $18,698.03 in bad debts incurred on sales by the corporate defendant during the accounting period.

(e) $681,575.80 in salaries and consultant's fees paid to the individual defendants by the corporate defendant during the accounting period.

(f) $22,508.40 for Key Life insurance premiums paid by the corporate defendant on the lives of the individual defendants during the accounting period.

(g) $17,110.52 for group insurance coverage on the lives of the individual defendants at various times during the accounting period.

The net profits of the defendants as recomputed by the second damage master totaled $954,388.62 during the accounting period.

Finally, the second damage master considered the question of the lost profits of the plaintiffs to the extent that they exceeded the profits of the defendants. The plaintiffs claimed that their profits on the sales made by the corporate defendant to the plaintiffs' customers would have totaled nearly $1,500,000 more than Crathco made on the same sales during the accounting period.

---

[15] Both the second damage master and the judge correctly computed damages based on the defendants' net profits, rather than on gross profits. See, e.g., *MacDonald* v. *Page Co.*, 264 Mass. 199, 206-208 (1928).

The master rejected this claim, finding the plaintiffs' evidence on this aspect of damages "conjectural, speculative and theoretically unsound."

The second damage master also found that the individual defendants had made no "profits as such." Therefore, he found in favor of the individual defendants.

Both the plaintiffs and the defendants filed objections to the second master's report. On September 23, 1977, the judge modified and then adopted the report of the second damage master. See Mass. R. Civ. P. 53(e)(2). He accompanied his order with a comprehensive, well reasoned memorandum of decision.

The judge allowed the defendants' deductions for bad debts and for salaries and consultant's fees paid to the individual defendants. The judge then computed the total of the defendants' net profits at $282,100.83.[16]

---

[16] The computation is as follows:

| "Profits as shown on Crathco's books after deducting loses ... | | $52,182.76 |
|---|---|---|
| *Added items* | | |
| Losses | $ 15,422.20 | |
| Legal Fees and Expenses | 105,553.17 | |
| Income and Corporation Excise Taxes | 41,337.90 | |
| Premiums for Key Man and Group Insurance | 67,604.80 | |
| | $ 229,918.07 | 229,918.07 |
| | Total | $282,100.83" |

It appears that the computation of the defendants' profits may have resulted in certain mathematical errors. First, the total figure for premiums for key man and group insurance as found by the master was $39,618.92. In the judge's computation, the defendants' net profit figure for the accounting period seems to have been inadvertently used instead of the proper figure for insurance premiums. Second, the master seems to have made a minor error in totaling the defendants' profits as shown on Crathco's books after deducting losses. Since Crathco's profits before deducting losses were $67,604.80 and the losses claimed were $15,422.20, the figure for Crathco's profits after

The judge further modified the second damage master's finding that the plaintiffs' lost profits could not be computed. He concluded that the second damage master's subsidiary findings were sufficient on their face to allow him to find that the plaintiffs' lost profits totaled $257,-068.

Finally, the judge rejected the second damage master's finding in favor of the individual defendants as precluded by our holding in *Jet Spray Cooler, Inc.* v. *Crampton, supra* at 844. He held the individual defendants jointly and severally liable with the corporate defendant.

Because the plaintiffs' lost profits were a lesser amount than the defendants' profits as computed by the judge, he awarded damages to the plaintiffs in the amount of the defendants' net profits. Both the plaintiffs and the defendants appeal from certain of the judge's modifications of the second damage master's report.

1. *Bad Debts.*

The judge allowed as a deduction from gross profits all bad debts incurred by the defendants on sales of the infringing products. See *Nelson* v. *J. H. Winchell & Co.,* 203 Mass. 75, 91 (1909). The plaintiffs urge us to adopt the approach taken by the Supreme Court of Colorado, expressed in *Hyman & Co.* v. *Velsicol Corp.,* 123 Colo. 563, 633 (1951), that bad debts may not be deducted from gross profits because a defendant should assume the risk of his extension of credit. This we decline to do. An accounting of the defendants' profits is designed to strip them of their impermissible gains. Where a defendant has suffered bad debts resulting from sales of products which he has manufactured, the defendant has incurred manufacturing expenses and has reaped no profits. He should not be required to pay over as profits funds never received. See *Nelson* v. *J. H. Winchell & Co., supra.*

deducting losses should be $52,182.60. Using the method of computation adopted by the Superior Court, once these errors are corrected the defendants' net profit figure is $254,114.79.

2. *Salaries and Consultant's Fees Paid to Individual Defendants.*

The plaintiffs also appeal from the judge's modification of the second damage master's report which allowed the defendants to deduct from their gross profits all salaries and consultant's fees paid to the individual defendants by the corporate defendant. The plaintiffs emphasize that the salaries and fees in question were paid to individuals who were defendants in this action. Therefore, the plaintiffs argue that the master properly refused to deduct their salaries and fees from the gross profits of the corporate defendant.[17]

We think that the judge correctly allowed the defendants to deduct the salaries and fees in question from gross profits on the basis of the judge's conclusion that "there are no findings that the salaries or consultant's fees were excessive or a disguised distribution of earnings or that the corporate defendant to whom the services were rendered was a sham." The question whether corporate officers are named as individual defendants should not determine whether their salaries may be deducted from a corporate defendant's profits. The determinative question should be whether their salaries and fees are reasonable in light of their positions as officers of the corporation "engaged in the conduct of the business and in the production of profits." *John B. Stetson Co.* v. *Stephen L. Stetson Co.*, 58 F. Supp. 586, 592 (S.D.N.Y. 1944). See *Clair* v. *Kastar, Inc.*, 70 F. Supp. 484, 487-488 (S.D.N.Y. 1946).

---

[17] The master relied on *Hyman & Co.* v. *Velsicol Corp.*, 123 Colo. 563 (1951), as authority for his disallowance of the salaries and fees. In *Velsicol*, the master disallowed a deduction for salaries paid to individual defendants, and the judge approved the master's report. Affirming the judgment, the Supreme Court of Colorado emphasized that the salaries disallowed were for the period "prior to the commencement of Julius Hyman & Company's operations" and did not disallow any deductions for salaries paid during the operation of the business. *Id.* at 632-633. By contrast, here the salaries allowed as deductions by the judge were paid during the operation of Crathco's business.

Since the judge found that the salaries paid to the individual defendants were reasonable in light of their positions in the corporation, he properly allowed their salaries and fees to be deducted from the gross profits of the corporate defendant.

3. *Computation of Plaintiffs' Lost Profits.*

The second damage master declined to make a finding of the amount of the plaintiffs' lost profits. He concluded that any figure which he arrived at would be too speculative.

The judge, however, modified the second damage master's report and computed the plaintiffs' lost profits at $257,068. To reach this result, the judge relied on the second damage master's subsidiary findings that the defendants had sold dispensers to over sixty of the plaintiffs' customers; that had the defendants sold no dispensers, it was reasonably possible that the plaintiffs would have made the sales to these same customers; that the defendants' sales to these customers totaled $2,-856,311.41, and that during the accounting period the plaintiffs' net profits before taxes averaged nine per cent of gross sales.

The judge multiplied the total of the defendants' sales to the plaintiffs' customers ($2,856,311.41) by the plaintiffs' profit margin (nine per cent). He concluded that the resulting total of $257,068 was "a sufficient approximation of the plaintiffs' loss of profits."

The defendants' objection to the judge's computation of the plaintiffs' lost profits rests solely on the defendants' contention that there is no evidence that the plaintiffs would have had the same volume of sales as the defendants. However, "[t]here is nothing unreasonable, in our view, in the judge's taking the gross tainted sales of [the defendants] as not exceeding the sales of which [the plaintiffs were] capable . . . ." *National Merchandising Corp.* v. *Leyden,* 370 Mass. 425, 431 (1976).

The second damage master's subsidiary findings provided sufficient information concerning both the defend-

ants' sales to the plaintiffs' customers and the plaintiffs' "established earnings records" to allow the judge to compute the plaintiffs' lost profits. *Matsushita Elec. Corp. of America* v. *Sonus Corp*, 362 Mass. 246, 264 (1972), quoting from *Rombola* v. *Cosindas*, 351 Mass. 382, 385 (1966).

However, where the master reports his subsidiary findings, we, like the judge below, may draw our own inferences and come to our own conclusions from the master's subsidiary findings. *Corrigan* v. *O'Brien*, 353 Mass. 341, 346 (1967). See *Peters* v. *Wallach*, 366 Mass. 622, 626 (1975). See generally J.W. Smith & H.B. Zobel, Rules Practice § 53.11 (1977).

In this action, the second damage master's subsidiary findings also reveal that during the accounting period the plaintiffs never marketed a product incorporating the recommendations contained in the Foster-Miller report.[18] The master further found that the Crathco dispenser offered "serious competition" to the Jet Spray dispenser "because it was superior to the dispensers produced by other manufacturers and also that Crathco's dispenser was comparable to Jet's particularly since it contained the improvements recommended in the Foster-Miller Report."

In light of these findings, we cannot determine whether the plaintiffs' lost profits in this action were "due to" the defendants' sales of products utilizing the trade secrets, or whether the plaintiffs' lost profits were "due to" the plaintiffs' own business decision to refrain from marketing products containing the information in the report. See *supra* at 173 & n.12. Here, the uncertainty in the assessment of damages arises not from any action of the defendants, but from the inaction of the plaintiffs. Com-

---

[18] In 1963, the plaintiffs sold to more than ninety per cent of the market for visual display beverage dispensers. Both masters found that the reason why the plaintiffs did not market products incorporating the information contained in the Foster-Miller report in 1963 was that the plaintiffs were saving the information for future development and marketing.

pare *National Merchandising Corp.* v. *Leyden, supra* at
430. Therefore, we conclude that the plaintiffs have not
proved their lost profits "due to" the defendants' sales to
the plaintiffs' customers with sufficient certainty to allow
the plaintiffs to recover damages based on lost profits.

4. *Joint and Several Liability of the Individual Defend-
ants.*

The judge modified the second damage master's report
to hold the individual defendants jointly and severally
liable with the corporate defendant. To reach this result,
he relied on *Jet Spray Cooler, Inc.* v. *Crampton, supra,*
where we held that "[t]he joint involvement of the corpo-
rate defendant and the [individual] defendants ... in util-
izing the secrets of the Foster-Miller report ... require[s]
that the damages, if any, shall be assessed against all of
them." *Id.* at 844.

Our resolution of this issue in 1972 is dispositive of the
question of the liability of the individual defendants. The
individual defendants actively participated in the misap-
propriation of the plaintiffs' trade secrets. They may not
insulate themselves from the consequences of their ac-
tions by choosing the corporate form by which to market
their products. Accord, *Donsco, Inc.* v. *Casper Corp.*, 587
F.2d 602, 605-606 (3d Cir. 1978); *Clark* v. *Bunker*, 453 F.2d
1006, 1010-1011 (9th Cir. 1972).

III. *Interest.*

The judge allowed interest on the plaintiffs' recovery
from the date on which the master filed his report. See
G. L. c. 235, § 8.[19] The plaintiffs maintain that they are
entitled to interest from an earlier date.[20] We think the

---

[19] General Laws c. 235, § 8, as appearing in St. 1973, c. 1114, § 219,
provides in pertinent part: "When judgment is rendered ... upon the
report of an auditor or master, ... interest shall be computed upon the
amount of the ... report, from the time when made to the time the
judgment is entered."

[20] The plaintiffs argue in the alternative that they are entitled to
interest from the date on which they filed the action, that they are
entitled to interest computed annually on the net profits of the defend-

judge correctly allowed interest only from the date of the filing of the master's report.

General Laws c. 235, § 8, requires the judge to add interest from the time the master files his report to the time judgment is entered in any action where the award is based on the report of a master. Beyond this statutory mandate,[21] "considerations of relative hardship" should govern an addition to the award, which represents interest from an earlier date. *Edgar H. Wood Assocs.* v. *Skene,* 347 Mass. 351, 366 (1964). Cf. *Watertown Firefighters, Local 1347* v. *Watertown,* 376 Mass. 706, 718 & n.25 (1978).

An award to a plaintiff of the defendant's net profits is made primarily to ensure that the defendant is not unjustly enriched as a result of his wrongful acts. See, e.g., *National Merchandising Corp.* v. *Leyden, supra* at 433. Since the award of a defendant's net profits is made only where the defendant's net profits exceed the plaintiff's demonstrable losses, the plaintiff may actually recover far more than its actual loss. *Id.* See *Sammons* v. *Colonial Press, Inc.,* 126 F.2d 341, 345-346 (1st Cir. 1942). Cf. *Mishawaka Rubber & Wooden Mfg. Co.* v. *S.S. Kresge Co.,* 316 U.S. 203, 207 (1942) ("There may well be a windfall to the trademark owner where it is impossible to isolate the profits which are attributable to the use of the infringing

ants, or that they are entitled to interest from September 30, 1975, the end of the accounting period utilized by the master.

[21] The plaintiffs claim that G. L. c. 231, §§ 6B, 6C, entitles them to interest from the date on which they filed the complaint in 1964. We disagree. Here, the monetary award is based primarily on profits and losses incurred subsequent to the filing of the action. Compare *Porter* v. *Clerk of the Superior Court,* 368 Mass. 116, 117 (1975). These statutes were not intended to award interest on damages accruing after the filing of the action, assuming that such interest is not actually an element of the damage itself.

Moreover, the plaintiffs made no showing to the master that they had incurred damages in the form of interest as an element of their lost profits. Compare *MacDonald* v. *Page Co.,* 264 Mass. 199, 207-208 (1928).

mark. But to hold otherwise would give the windfall to the wrongdoer").

Here, the plaintiffs have been awarded the entirety of the defendants' net corporate profits from 1964 to 1975.[22] This award is made because it is impossible for the defendants to segregate the portion of their profits which is attributable to the misappropriated trade secrets from the portion of their profits which may be attributable to other factors.[23] See, e.g., *Carter Prods., Inc.* v. *Colgate-Palmolive Co.*, 214 F. Supp. 383, 399 (D. Md. 1963). Thus it is likely that the "plaintiff may recover more than his exact loss." *National Merchandising Corp.* v. *Leyden, supra.*

In these circumstances, we do not think that the plaintiffs will be unfairly deprived of compensation or that the defendants will be "unjustly enriched if [they are] not required to pay interest on the total profits so awarded."[24] *Carter Prods., Inc.* v. *Colgate-Palmolive Co., supra* at 417.

---

[22] In many cases involving business torts, a defendant will market a variety of products, only some of which subject him to liability. An accounting for profits in such cases *only* requires the defendant to surrender his net profits from offending products. See, e.g., *Carter Prods., Inc.* v. *Colgate-Palmolive Co.*, 214 F. Supp. 383, 394-400 (D. Md. 1963). Similarly, where a defendant produces a variety of products, he may deduct from his gross profits only that portion of his business expenses which he can demonstrate are attributable to the production of offending products. See, e.g., *Eno* v. *Prime Mfg. Co.*, 314 Mass. 686, 692 (1943); *MacDonald* v. *Page Co.*, 264 Mass. 199, 207 (1928).

By contrast, here the defendants apparently have marketed no product which does not contain the misappropriated trade secrets. Therefore, their entire net corporate profits are subject to the accounting.

[23] Profits may not result from a single source. For example, they may well result from the use of a trade secret combined with management skill, capital investment, and such other factors as tend to produce profit in any enterprise. In this case, however, it appears that the defendants were unable to separate that portion of profits attributable to the use of the trade secret from that portion attributable to other profit factors. See note 14, *supra.*

[24] The plaintiffs rely on *H. D. Foss & Co.* v. *Whidden*, 254 Mass. 146, 151-152 (1925), and *Coyne Indus. Laundry of Schenectady, Inc.* v.

The observation of the United States Court of Appeals for the Seventh Circuit in *L. P. Larson, Jr., Co.* v. *William Wrigley, Jr., Co.*, 20 F.2d 830, 836 (7th Cir. 1927), rev'd on other grounds, 277 U.S. 97 (1928), is particularly apt here: "The award here in issue is so palpably and unquestionably ample to fully compensate [the plaintiff] for any and all invasion of its rights, as to suggest no circumstances which invoke the court's discretion to enlarge it by allowance of interest back of the date of the master's report . . . ." Therefore, the judge properly awarded interest only from the date on which the second damage master's report was filed. See G. L. c. 235, § 8. Accord, *Tilghman* v. *Proctor*, 125 U.S. 136, 160-161 (1888); *Carter Prods., Inc.* v. *Colgate-Palmolive Co.*, *supra* at 418.

The judgment of the Superior Court is to be modified in accordance with this opinion and, as thus modified, is affirmed.

*So ordered.*


KAPLAN, J. (concurring). I join in the decision of the court, but with the feeling that the damages allowed are excessive. They are made so by being cast over a period of eleven years. The court indicates at note 13 that the "secret" was a simple one, a result of ordinary mechanical skill, and intimates some doubt that it could survive

---

*Gould*, 359 Mass. 269, 278-279 (1971), to support their claim that they are entitled to interest from September 30, 1975, the end of the accounting period utilized by the master. However, in both of these cases the monetary award was grounded on the plaintiff's injury, and not on the defendant's wrongful profits. Interest in both cases was awarded in order to place the plaintiff "in the same position in reference to the injury as if the damages directly resulting from the injury had been paid immediately." *Id.* at 278, quoting from *H. D. Foss & Co.* v. *Whidden*, *supra* at 151.

No such compensation is necessary in this action. See, e.g., *L. P. Larson, Jr., Co.* v. *William Wrigley, Jr., Co.*, 20 F.2d 830, 836 (7th Cir. 1927), rev'd on other grounds, 277 U.S. 97 (1928).

as a protectible entity on October 1, 1975. I suspect that it had perished in that sense some time before; that is to say, in the ordinary course of events the secret in substance would have become known and available at an earlier date, even if the defendants had not appropriated it and the plaintiffs had tried to keep it to themselves. This, however, was a matter of proof, and the trouble was, and is, that the record is virtually barren of the relevant facts and inferences.

In adding these remarks, I would like to suggest that if, as we are told, the law of trade secrets does not necessarily conflict with the patent law,[1] there is still excellent reason to apply it with beseeming modesty.

---

[1] *Kewanee Oil Co.* v. *Bicron Corp.*, 416 U.S. 470 (1974). Doerfer, The Limits on Trade Secret Law Imposed by Federal Patent and Antitrust Supremacy, 80 Harv. L. Rev. 1432 (1967).