CHOMERICS, INC. *vs.* JOHN E. EHRREICH & another.[1]

Middlesex. May 23, 1979. — June 1, 1981.

Present: GOODMAN, ROSE, & GREANEY, JJ.

*Trade Secret. Practice, Civil, Master. Malicious Prosecution. Unfair Competition.*

In an action for misappropriation of trade secrets, a master's findings that the defendant, a scientist who had been employed by the plaintiff, had conceived of and experimented on certain possibilities for the development of a new product while in the plaintiff's employ and that the experiments had been unsuccessful and were regarded as valueless by the plaintiff either to its own business or to potential competitors warranted the conclusion that the plaintiff was not entitled to any relief on the basis of the defendant's subsequently successful development of the product to which the earlier experiments had been aimed since the defendant had taken with him when he left the plaintiff's employ nothing but possibilities and goals which had theretofore proved impossible to bring to fruition and which were a part of his own experience and development as a scientist and did not therefore constitute protectible information. [6-11]

In an action for misappropriation of trade secrets, the defendants' counterclaim for malicious prosecution was properly dismissed even though they ultimately prevailed in the main action where nothing in the record negated the plaintiff's reasonable belief in the possibility that it had a valid claim. [11-12]

BILL IN EQUITY filed in the Superior Court on August 22, 1969.

---

[1] Ercon, Inc.

The case was heard by *Dimond, J.*, on a master's report.

*David G. Conlin* (*Sewall P. Bronstein & Robert K. Lamere* with him) for Chomerics, Inc.

*Mary Helen Sears* (*William A. Zucker* with her) for John E. Ehrreich & another.

GOODMAN, J. The plaintiff, Chomerics, Inc. (Chomerics), appeals from a judgment of the Superior Court dismissing an action brought against Ehrreich, its former employee, and Ercon, Inc. (Ercon), a corporation in which Ehrreich is now a principal. The defendants appeal from the dismissal of their counterclaim. The complaint alleged misappropriation of trade secrets and confidential information relating to electrically-conductive plastics and gaskets made therefrom; the counterclaims were for malicious prosecution and unfair competition. The case was tried before a master (facts final),[2] who concluded that the allegedly misappropriated information was not protectible as trade secrets but that some of the items of the information, though "they do not rise to the status of trade secrets," were protectible as what the master characterized as "confidential information."[3]

The trial judge, after hearing, struck "the master's conclusion as to the protectibility of the plaintiff's information as confidential data [because it was] not supported by the subsidiary facts in the report . . . ." He also sustained objections to various portions of the master's report "so far as they are directed to the face of the report and challenge the implied ultimate finding that the information was protectible."[4]

---

[2] The order of reference required the master "to hear the parties . . . find the subsidiary facts on each issue tried and report them and his general findings based on such subsidiary findings to the court." Rule 86(B) of the Superior Court, in effect prior to July 1, 1974. The order of reference was amended to provide that "the report of the master . . . shall cover all issues except damages . . . ."

[3] The master also found that "the defendants have utterly failed to support their counterclaims."

[4] While this specific phraseology was used in connection with two of the objections which were sustained, a third also falls into the same category,

Our examination of the master's report likewise convinces us that, in context, the references to "confidential information," "confidential know-how," and similar expressions to which the trial judge alludes, are merely conclusions of law that certain matters are protectible. *Dynamics Research Corp.* v. *Analytic Sciences Corp.*, 9 Mass. App. Ct. 254, 277-278 (1980). *Van Prod. Co.* v. *General Welding & Fabricating Co.*, 419 Pa. 248, 263 (1965). See *Laughlin Filter Corp.* v. *Bird Mach. Co.*, 319 Mass. 287, 290 (1946) ("The vague adjective 'confidential,' expressive at most of a conclusion not supported in this case by the particular facts alleged, does not constitute by implication an allegation of some set of subsidiary facts that would support the conclusion for which the plaintiff contends"). Thus they were properly struck. *Sprague* v. *Rust Master Chem. Corp.*, 320 Mass. 668, 677 (1947). *Smigliani* v. *Smigliani*, 358 Mass. 84, 87 (1970).

The judge adopted the report, as modified, concluded on the face of the report that no relief was justified, and dismissed the complaint. Our review is likewise directed solely to determining whether any relief is justified on the factual findings of the master as appearing on the face of the report. *National Hearing Aid Centers, Inc.* v. *Avers*, 2 Mass. App. Ct. 285, 286 (1974). *Jones* v. *Gingras*, 3 Mass. App. Ct. 393, 395-396 (1975).[5]

for the objection was made on the ground that the relevant portion of the master's report contained a legal conclusion and was allowed "so far as it is directed to the face of the report." For the sake of completeness we further mention that the judge sustained the defendants' objection to the assertion that the plaintiff had satisfied its burden "that alleged breaches by defendants caused actionable injury." Here, too, the objection was made on the ground that this was "an ultimate conclusion."

[5] The plaintiff asserts in its brief that "[t]here are no crucial subsidiary findings on vital issues lacking in this case." We agree, and for this reason we do not believe to be applicable cases like *Dodge* v. *Anna Jaques Hosp.*, 301 Mass. 431, 436 (1938), *American Employers' Ins. Co.* v. *Cohen*, 334 Mass. 417, 421 (1956), or *Bills* v. *Nunno*, 4 Mass. App. Ct. 279, 283 (1976), which state that where a vital issue has not been dealt with by the master recommittal may be required. Rather, this is the ordinary situa-

The plaintiff argues that information appropriated by the defendants was protectible both as trade secrets and as confidential information. The defendants argue that they are entitled to recommittal of the report in connection with their counterclaim for malicious prosecution.

1. *Facts in the master's report.* We summarize the background facts from the master's report: Chomerics was founded and organized in 1961 by a small group of engineers and scientists, including Ehrreich, who became its director of research, vice president and a member of its board of directors. It engaged in developing and perfecting electrically-conductive plastic materials for the electronics and other industries; plastics were rendered electrically-conductive by metal particles embedded in a plastic matrix. Chomerics obtained a patent on gasketing material using silver particles which did not fall below 10% by volume. Chomerics' effort in this field was pioneered largely through Ehrreich's inventions and research from 1961 until he left Chomerics' employ. As the master found, "he was responsible for the research program at Chomerics and was personally actively involved in all of the inventions and discoveries made at Chomerics concerning conductive plastics . . . ." The master further found that the effort in conductive plastics "was peculiarly his [Ehrreich's] almost private domain at Chomerics," and that even at the trial, many years later, he "showed himself . . . to have a very detailed memory of all phases of the work . . . ."

Ehrreich, as employee, signed an employment agreement with Chomerics, as employer, which included, under the heading "Inventions and Confidential Technical Information," a provision (par. 6[a]) giving Chomerics exclusive rights in "all inventions and improvements made or conceived . . . while in the employment of the Employer . . .

---

tion where a plaintiff has not been able to sustain his burden of justifying relief on the face of the master's report and for that reason fails to vindicate his claim. The plaintiff also asserts that "the only evidentiary facts before the lower Court and before this Court are those found by the master in his report."

and also those made or conceived within one year after the termination of his [Ehrreich's] employment if *resulting from or suggested by said employment*" (emphasis supplied). It also contained a two-year noncompetition provision.[6] The clause of the contract (par. 6[c]) which Chomerics claims was violated provides that the employee will not "at any time disclose or use any trade secret, formula, process, method of manufacture or any confidential record, data or information of the Employer or any subsidiary (whether developed by the Employee or not) . . . ."

In 1965, Ehrreich left Chomerics; and in 1967, after the expiration of his two-year noncompetition agreement, he and one Reti founded and became the principals of Ercon, a corporation the purpose of which was research and consulting to develop items for licensing. Their early endeavors were in the field of conductive plastics and were directed to obtaining gaskets with a minimal silver content. They succeeded in developing a product containing less than 10% silver in contrast to the 10% minimum achieved by Chomerics. Their gaskets also contained considerably greater compressibility than earlier products. The inventions embodying these features and the method of achieving them were patented by Ehrreich and Reti, who assigned the patent to Ercon. Ercon licensed Technical Wire Products, Inc. (Technical),[7] to use the patent and furnished it with further technical information. Technical thereupon marketed a gasket containing those features under the name CONSIL.

The plaintiff claims that various "concepts," found by the master to be "phrases describing ideas" which (with one exception) "can be at least generically read on CONSIL," were misappropriated by the defendants. The issue as

---

[6] There is no dispute that Ehrreich in good faith complied with the provision concerning "inventions and improvements" and the noncompetition agreement.

[7] This corporation was originally made a party defendant, but the case has been dismissed as to it. It is agreed that the dismissal does not affect the remaining litigants.

posed by the plaintiff is whether these concepts[8] are protectible as either trade secrets or confidential information.

2. *Protectibility of the information.* Whether information is protectible "in each case depends on the conduct of the parties and the nature of the information." *Jet Spray Cooler, Inc.* v. *Crampton,* 361 Mass. 835, 840 (1972) *(Jet Spray I).* See *Jet Spray Cooler, Inc.* v. *Crampton,* 377 Mass. 159, 168 (1979) *(Jet Spray II).* In the context of the employer-employee relationship those two factors are interrelated.[9] We therefore look both to the nature of what Ehrreich acquired and the circumstances under which he acquired it.

To begin with, it cannot be said that this is "information acquired from another." *Jet Spray II,* 377 Mass. at 165. Compare *Junker* v. *Plummer,* 320 Mass. 76, 78-80 (1946), and *Jet Spray I,* 361 Mass. at 840-844, with *Wexler* v. *Greenberg,* 399 Pa. 569, 572 n.1, 575-576, 577-578 (1960), and *Amoco Prod. Co.* v. *Lindley,* 609 P.2d 733, 745 (Okla. 1980). See also 2 Callman, Unfair Competition, Trademarks and Monopolies § 54.2(a), at 420 (2d ed. 1965). The master found that this area of research was Ehrreich's "almost private domain at Chomerics" and that at the time of trial he had a "very detailed memory of all phases of the work."[10]

---

[8] As the parties argue the case, only five or six (it is not clear exactly how many) of the original twenty-six concepts are in issue.

[9] Ehrreich's status as officer and director "did not make information otherwise properly acquired, confidential." *American Window Cleaning Co.* v. *Cohen,* 343 Mass. 195, 200 (1961). *J.T. Healy & Son* v. *James A. Murphy & Son,* 357 Mass. 728, 740 (1970). See *Anderson Corp.* v. *Blanch,* 340 Mass. 43, 45, 53 (1959); *Wilson* v. *Jennings,* 344 Mass. 608, 620-621 (1962); *Berkshire Apparel Corp.* v. *Stogel,* 360 Mass. 863 (1971); and *Cain* v. *Cain,* 3 Mass. App. Ct. 467, 478-479 (1975), making no distinction between the duties of officers, directors, and employees in this context.

[10] Particularly because of Ehrreich's detailed memory the master found that "Ehrreich's leaving with his notebooks under the circumstances of his departure from Chomerics is not convincing of wrong-doing of itself. . . ." Nor is there any indication in the master's report that Ehrreich left Chomerics intending to exploit an invention he had already conceived while there. See *Koehring Co.* v. *E.D. Etnyre & Co.,* 254 F. Supp. 334,

The issue is then whether Ehrreich was guilty of reprehensible conduct (Restatement of Torts § 757, Comment b [1939]) in using the knowledge with which he left Chomerics or whether that use was the exercise of his "right to use [his] general knowledge, experience, memory and skill." *J.T. Healy & Son* v. *James A. Murphy & Son*, 357 Mass. 728, 740 (1970), quoted in *Dynamics Research Corp.* v. *Analytic Sciences Corp.*, 9 Mass. App. Ct. at 267.[11] See Restatement (Second) of Agency § 396, Comment b (1958). *Reed, Roberts Assoc., Inc.* v. *Strauman*, 40 N.Y.2d 303, 309 (1976).

With respect to the nature of the information as described in the master's report, it belies the master's conclusion of law that there was "a clear crossing of [the] line" and a taking of protectible information. The master's report shows that while Ehrreich was at Chomerics the concepts were mere possibilities ("vague mental conceptions . . . ." *Lamson* v. *Martin*, 159 Mass. 557, 565-566 [1893]) which might result in a more economical gasket containing less than 10% silver. The master's report characterizes them as "laboratory indications of possibly useful results . . . ." But it is clear that these possibilities, in Ehrreich's exclusive area of research, were conceived by him and it was he who experimented on the basis of those possibilities, which did not go beyond (as put by Professor Alfred North Whitehead in a

---

362 (N.D. Ill. 1966); *Jamesbury Corp.* v. *Worcester Valve Co.*, 318 F. Supp. 1, 7-9 (D. Mass. 1970), aff'd, 443 F.2d 205 (1st Cir. 1971). Cf. *National Dev. Co.* v. *Gray*, 316 Mass. 240, 249-250 (1944). Indeed, it is not clear that "his notebooks" were copies of the material left with Chomerics in its notebooks.

[11] In that case we said: "We start with the 'well settled [rule] that an employee upon terminating his employment may carry away and use [his] general skill or knowledge acquired during the course of [his] employment.' *Junker* v. *Plummer*, 320 Mass. 76, 79 (1946) [and other cases cited]." This "promotes the public interest in labor mobility and the employee's freedom to practice his profession and in mitigating monopoly. The law thus maximizes the benefit of the national store of skill and knowledge. [Cases and material cited]." *Dynamics Research Corp.* v. *Analytic Sciences Corp.*, 9 Mass. App. Ct. at 267.

somewhat different context) the "state of imaginative muddled suspense which precedes successful inductive gener-alisation." Whitehead, Science and the Modern World 8 (Pelican Mentor ed. 1948). The experiments, however, were unsuccessful; they "did not result in any commercial products of plaintiff through the time of Ehrreich's employment by Chomerics." Indeed, the experiments were regarded as valueless by Chomerics.[12] The master found that there was no "convincing proof that (1) plaintiff, during Ehrreich's employment at Chomerics, ever regarded or treated the con-cept[s] (even though in locked-up notebooks[13]) as of any trade value whatsoever or that plaintiff ever regarded these preliminary laboratory experiments as proving anything of real technical or trade value; (2) the [plaintiff] fail[ed] to overcome the strong presumption that plaintiff did not so regard the same [as shown] by the lack of follow-up of the ex-periments, the lack of expenditure of effort or funds thereon, the failure to attempt to make a commercial grade product from the same or to consider such a possibility or even the marketing of any such product; and (3) [there was a] com-plete absence in the record of convincing evidence that plain-tiff regarded [these] not only as valuable to its own business, but of any value to potential competitors."[14]

---

[12] There is no indication that they were otherwise regarded by Ehrreich. (See n.10.)

[13] The master seems here to note the anomaly of keeping in locked note-books material not considered of any value. The master found that "these same notebooks contain many other experiments and data as well, in-cluding, moreover, much that was not actually confidential informa-tion." Under the circumstances, the locked notebooks betoken merely the normal desire of a businessman to keep his business private. See *New Method Die & Cut-Out Co.* v. *Milton Bradley Co.*, 289 Mass. 277, 281 (1935); *Dynamics Research Corp.* v. *Analytic Sciences Corp.*, 9 Mass. App. Ct. at 268. To label the material in them "confidential" is at best ambiguous. *Laughlin Filter Corp.* v. *Bird Mach. Co.*, 319 Mass. at 290. Such labeling by Ercon in dealing with Technical, which the plaintiff stresses, is even more remote and insignificant. *National Rejectors, Inc.* v. *Trieman*, 409 S.W.2d 1, 25, 52 (Mo. 1966).

[14] We do not consider the plaintiff's argument that G. L. c. 93, §§ 42 and 42A (inserted by St. 1967, c. 817, § 3, and St. 1969, c. 457, respec-

Thus when Ehrreich left Chomerics he took with him nothing but possibilities and goals which had hitherto proved impossible to bring to fruition. That he had worked on these possibilities and goals[15] for Chomerics or that they occurred to him while at Chomerics does not make them (aside from misconduct, *USM Corp.* v. *Marson Fastener Corp.*, 379 Mass. 90, 104 [1979], which is not present here[16]) any the less a part of his experience and development

---

tively), provide damages and injunctive relief for trade secrets "regardless of value." It does not appear that the argument was made either before the master or before the trial judge. *Jet Spray II*, 377 Mass. at 166 n.8. There is no reference to those statutes in the record — not even in the amended complaint filed in 1972, after the statutes had become effective.

We do not in any way intimate that these statutes change the ambit of trade secret protection in a civil action. See *Commonwealth* v. *Robinson,* 7 Mass. App. Ct. 470, 473 (1979); see also *Matter of a Civil Investigative Demand Addressed to Yankee Milk, Inc.*, 372 Mass. 353, 359-360 (1977). We find it difficult to believe that these statutes, read together with the definition of trade secrets in G. L. c. 266, § 30(4), were meant to change the common law of trade secrets to permit damages where nothing of value has been taken or an injunction to protect valueless information contrary to traditional and long-settled equity principles. See Schneider & Halstrom, Trade Secret Protection in Massachusetts, 56 Mass.L.Q. 239, 259-260 (1971). See also Fetterley, Historical Perspectives on Criminal Laws Relating to Theft of Trade Secrets, 25 Bus. Law. 1535, 1537 (1970).

[15] We are not herein involved with "any formula, patent, device, or compilation of information which [was] used in [Chomerics'] business and which gave [it] an opportunity to obtain an advantage over competitors who did not know or use it." Chomerics had been unsuccessful in developing "a process or device for continuous use in the production of the goods." Restatement of Torts § 757, Comment b (1939).

[16] In a case such as ours, information which is so "closely tied to the intrinsic knowledge of the inventor . . . [that it is not] possible to sort the process from the inner workings of a man's knowledge" is not protectible. *Amoco Prod. Co.* v. *Lindley*, 609 P.2d at 745. We do not require an employee "upon terminating his employment [to] search his mind for all thoughts relating to the business of his employer and set these down for the employer's reference . . . [so that] thereafter, he is forever precluded from employing such thoughts in a competitive enterprise." *Koehring Co.* v. *E.D. Etnyre & Co.*, 254 F. Supp. at 355. To do this would be to give insufficient weight to the employee's right to use "the product of his knowledge acquired previous to [his] employment, and of the use of his faculties, skill and experience in the ordinary course of his employment . . . ." *New Method Die & Cut-Out Co.* v. *Milton Bradley Co.*, 289 Mass. at 282-283.

as a scientist which he was entitled to use, as put by the master, "to design around the 10% silver limitation of Chomerics patent protection. . . ."[17]  In this respect, this case is much like *Vendo Co.* v. *Stoner*, 105 Ill. App. 2d 261 (1969), where the defendants, after leaving the plaintiff's employ, had produced a vending machine containing features which the plaintiff had been attempting to develop. In ruling that no trade secrets were involved, the court said, "If Vendo had discovered the *means* of achieving its goal, we might well have had a different view as to whether Vendo had a trade secret. . . . We know of no authority for the proposition that an ultimate goal or purpose, as distinguished from the means of achieving it, can be classified as a trade secret" (emphasis original).  *Id.* at 278.  *Gabriel Co.* v. *Talley Indus.*, 137 U.S.P.Q. 630, 633 (BNA) (D. Ariz. 1963) (protection only for a "perfected product or process"). *Packard Instr. Co.* v. *Reich*, 89 Ill. App. 3d 908, 916 (1980) (protection only for "particularized plans and processes").

Nor does the employment contract help the plaintiff.  In the circumstances, here, where all the parties regarded the information as of no value, it can hardly be said that the contract alerted the defendant Ehrreich to a duty to keep the information secret.  Compare *USM Corp.* v. *Marson Fastener Corp.*, 379 Mass. at 99, and material cited. Moreover, fair dealing between the employer and employee negates such a duty in this case and makes par. 6(c) of the contract imposing such an obligation unenforceable as to these con-

---

[17] On our analysis the distinction which the master made — and the plaintiff presses — between trade secrets and confidential information is irrelevant — assuming that there is such a distinction.  See *Jet Spray II*, 377 Mass. at 165 ("The essence of an action for the wrongful use of *trade secrets* is the breach of the duty not to disclose or to use without permission *confidential information* acquired from another" [emphasis supplied]).  See also *Woolley's Laundry, Inc.* v. *Silva*, 304 Mass. 383, 388 (1939); *Junker* v. *Plummer*, 320 Mass. at 80.  Cf. *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 674 (1977).  On the facts of this case, whatever the label, the policy against protection of information of this sort clearly applies.

cepts. *Dynamics Research Corp.* v. *Analytic Sciences Corp.*, 9 Mass. App. Ct. at 277-278.

Further, as the trial judge pointed out, the "confidential information" referred to in par. 6(c) of the contract means "developed" information, something more than the achievement of "a preliminary indication." Such protection as there may be for "laboratory indications of possibly useful results" is found not in par. 6(c) but in 6(a), with which it must be read (*Ucello* v. *Cosentino*, 354 Mass. 48, 51 [1968]; *Avant, Inc.* v. *Tech Ridge, Inc.*, 4 Mass. App. Ct. 568, 574 [1976]), and which grants Chomerics the right to "all inventions and improvements made [by Ehrreich] . . . within one year after the termination of his employment *if resulting from or suggested by said employment*" (emphasis supplied). Thus, as the trial judge concluded, "[t]he reference in subparagraph (c) to 'any trade secret, formula, process or any confidential record' . . . must, in our judgment, be taken to mean information that has gone beyond the mere 'laboratory indications of possible useful results . . . .'" The type of information for which Chomerics here seeks protection is "more properly the subject matter of a covenant not to compete" (*Cudahy Co.* v. *American Labs., Inc.*, 313 F.Supp. 1339, 1345 [D. Neb. 1970]) which the contract provided and with which Ehrreich complied. *Koehring Co.* v. *E.D. Etnyre & Co.*, 254 F.Supp. at 339, 340. See *Textile Rubber & Chem. Co.* v. *Shook*, 243 Ga. 587, 591-592 (1979).

3. *The defendants' counterclaim.* This requires no extended discussion. The master found that "[t]he elements of malicious prosecution have not in any sense been shown." The defendants' argument that they ultimately prevailed (compare *Cloon* v. *Gerry*, 13 Gray 201, 202 [1859]) is of no help to them since nothing in the master's report or elsewhere in the record negates the plaintiff's "reasonable belief in the possibility that the claim [might have been] held valid." *Hubbard* v. *Beatty & Hyde, Inc.*, 343 Mass. 258

261 (1961).  Prosser, Torts § 120, at 854 (4th ed. 1971). Our appraisal of the case, as we have considered it, leads us to the same conclusion.[18]

*Judgment affirmed.*

---

[18] We deny each party's motion to strike the opposing reply brief; neither brief is a model of restraint.