Brady, J.
Background
The plaintiff seeks injunctive relief prohibiting the defendants from working in and/or conducting the business of selling oriental and Persian rugs and of divulging any proprietary and/or confidential information of the plaintiff. The complaint was filed on January 24, 2003. On February 4, 2003, after hearing, I granted plaintiffs request for preliminary injunction and, in view of the possibiliiy that the defendants might be financially harmed because of their temporary inability to conduct rug sales pending trial, I advanced the case for a speedy trial on March 17, 2003. Counsel to their credit acted cooperatively with respect to discovery, and the trial (delayed briefly due to plaintiffs counsel’s illness) began on Friday, March 29, 2003 and concluded on April 2, 2003. For reasons stated on the record, I imposed what I considered to be reasonable time limits on the presentation of evidence.[1]
The evidence was sharply conflicting. On the credible evidence before me, I find and rule as follows.
Findings
1. The plaintiff United Rug Auctioneers, Inc. (United) is a Massachusetts Corporation whose business is the liquidation of oriental and Persian rugs. The principals are three brothers: Ronen, Joseph, and Nir Droiy.
2. The defendant Allied Rug International Auctioneers, LTD (Allied) is a Delaware corporation incorporated on December 5, 2002. As will be discussed hereafter, the defendants Arie Arsalen, Edmon Mam-ane and Beth Reed are three individuals who are associated with Allied. The defendant Ario, Inc. is an alter ego of Allied.
3. Ronen Droiy (age 27) is the prime mover of United. Bom in Framingham, his family moved to Israel when he was veiy young. In 1993 he returned to the U.S. and began to work in the oriental mg business. After working for several years for a mg company which went out of business, he started his own mg business in about 1996. His brothers Joseph and Nir Droiy eventually joined him in the business. Ronen Droiy encountered some difficulties at the beginning, but eventually evolved a business strategy which, by 2002, was proving to be veiy successful.
4. United’s business is to conduct liquidation sales of oriental and Persian mgs by auction and otherwise on weekends at various temporary locations in Massachusetts and other nearby states. United operates out of a warehouse in Canton. It purchases its mgs from three vendors in New York City, primarily Sam Shamoulian. Picking locations from which to sell is of paramount importance. Basically, Ronen Droiy determines sales locations based on cities or towns whose average per capita income in the town and in the surrounding vicinity is high. The mgs are handmade, relatively expensive, and thus most sales locations are in affluent suburbs. When Ronen Droiy determines the location, he will schedule a facility from which to conduct the sale or auction. A few weeks prior to the sale, United advertises by direct mail flyers to households within certain nearby zip codes. The flyers are generally headed by bold captions such as “Liquidation Auction” or “Federal Notice Auction” and *421 contain language emphasizing that the rugs are forced to be sold immediately at substantial discounts.
5. The defendant Arie Arsalen grew up with the Drory brothers in a suburb of Jerusalem. On several occasions beginning about 1995, Arsalen traveled to the U.S. to visit Ronen Droiy and to work with him in the rug business. While in the U.S. he would live with Ronen in his apartment in Canton. The rug work that he did consisted primarily of manual labor, loading and unloading rugs and occasionally running errands. From time to time he would accompany Ronen Droiy to New York City to purchase rugs. For aperiod of time in about 1998Arsalen also worked with Joseph Droiy as a mechanic in Florida.
6. In February 2002 Arsalen again returned to the United States and was living in California. Ronen Droiy called him and asked him to come to Massachusetts to work with him in the rug business. Arsalen was willing, but made it clear that he did not want to do mainly physical labor; rather he wanted to acquire knowledge about the rug business and to work as a salesman. Ronen Droiy agreed; Arsalen then came to Massachusetts in early March, again taking up residence with Ronen in Canton.
7. With Arsalen’s arrival, Ronen Droiy purchased a new truck which he assigned to Arsalen. United typically will send out four or five trucks of rugs to different locations for the weekend sales. One or two United employees accompany the truck and run the sale. Thus Arsalen began to become intimately acquainted with the details, including the profitability, of United’s business.
8. Arsalen worked for United from early March 2002 to early October 2002, when he quit. He attended and participated in approximately twenty-one weekend sales or auctions, usually with Joseph Droiy but occasionally with Nir Droiy or Ronen Droiy. For the first few weeks his duties were much as before, namely loading and unloading the trucks. Gradually, the Drory brothers taught him the job of salesman. At core, an effective salesman must be veiy familiar with the details of oriental and Persian rugs, including quality, origin, size and cost. The Droiys gave Arsalen pricing authority. Arsalen knew precisely what each rug cost and for what price he could sell the rug to interested customers. He became privy to all aspects of United’s business.
9. The location of the sales is vitally important to the success of the business. As indicated, the most affluent suburbs are targeted, but there are other locations which do not rank at the top of the average income scale which also have proven to be profitable. Wrentham is one such location. Likewise, the facility to be used for the sale is important. Over the years, the Droiys have built up relationships with various managers of facilities which they are able to rent for a weekend sale, and whom they can trust to keep the information confidential.
10. For each rug sale location United maintains a historical file which contains information such as directions to the site, vendor’s licenses required, contact persons, and summaries of prior sales. The file for each location is stored securely at the company warehouse in Canton; it accompanies the salesmen to the location of the sale. On Sunday evening following a sale, the salesman will return the file to Ronen’s apartment.
11. In June 2002 Ronen Droiy, who regarded his method of doing business as confidential and proprietary, decided that it would be prudent to require his key non-family employees to sign confidentiality and non-competition agreements. United’s lawyer prepared a form agreement which several of United’s employees were required to sign.
12. On June 19, 2002 Ronen Droiy and United secretary Kim Bevins presented such an agreement to Arsalen at the warehouse in Canton. Arsalen’s first language is Hebrew, but he speaks fluent English and is able to read English. He spent several minutes reviewing the form. Km Bevins explained the nature of the contract to Arsalen. He signed it. Thereafter, Bevins made a photocopy of the three-page contract and gave the original to Ronen Droiy. While making the photocopy, the machine jammed after the first two pages. Ms. Bevins used a fax machine to copy the third (signature) page. Ronen Droiy took the original home with him and placed it in his closet. When the events which gave rise to this lawsuit came to his attention, Ronen Droiy was unable to locate the original.
13. The defendant Edmon Mamane is an acquaintance of the Droiys through their uncle, Moishe Attias. Arsalen met Mamane several years ago at a social event at Attias’ house. Mamane came to the United States from Israel in 1983. He is now age forty-five. He is an experienced businessman, and has run several businesses before. He had some modest prior experience in selling oriental rugs on consignment for a rug company in Boston in the 1990s. He formally changed his last name from “Mamane” to “Hamane” in 1984. He seems to find it expedient to use two names, and two social security numbers as well.
14. In the fall of2002, Mamane and Arsalen renewed their acquaintanceship. At some point they decided to go into the rug business together to compete with the Droiys. Arsalen was well aware that he had entered into a non-competition and confidentiality agreement, and asked Ms. Bevins for a copy of it in late September prior to leaving United. Mamane and Arsalen, together with Mamane’s girlfriend, Beth Reed (whom he describes as his partner for life), then embarked on a course of action to conduct a business that would mirror United’s.
15. In particular, Arsalen and Mamane did the following;
a. Traveled to New York City to meet several times with Sam Shamoulian, United’s primary vendor. Shamoul-ian knew Arsalen from prior trips to New York City with Ronen Droiy to purchase rugs. According to Shamoul-ian, whose testimony I credit, Arsalen told Shamoulian *422 that they wanted to purchase the same selection, or “mix,” of rugs as he sold to United, and for the same price. Arsalen was well versed in the technical details of rugs, and participated to a much greater extent than Mamane who appeared to Shamoulian to lack knowledge about rugs. Arsalen asked Shamoulian not to tell Ronen that they were there.
b. Scheduled several rug sales at locations and facilities used by United in the past, namely Wrentham, Wellesley, Hingham, Concord, Stowe (Mass.), and Northboro.
c. Conducted a rug sale on January 18-19, 2002 in Wrentham. Arsalen worked as a rug salesman at the show.
d. Utilized the same method of direct mail advertising as United did, with flyers substantially similar to the flyers put out by United. Mamane told one of his advertising agencies, Advo, Inc., that he wanted the flyers to look exactly like United’s.
e. Solicited several employees of United (Panagua, Gonsalves, and Izakof) to leave United and work for Allied at a higher rate of pay.
16. Defendants all deny any concerted activity to “copy” United’s business. Mamane insists that he did his own research and investigation without input from Arsalen. I do not And his testimony credible. Examples of evidence to the contrary:
a. Telephone records reflect literally hundreds of calls between Arsalen and Mamane from late October 2002, through January 2003. These are two men of dissimilar ages and experience who have little in common beyond their native language, Hebrew. I infer that these numerous communications were primarily concerning the rug business.
b. Mamane seems to have no compunctions about misstating the truth. At the same time he was actively engaged in starting Allied, he answered an interrogatory put to him by his wife in their divorce proceeding denying that he was attempting to start any business, and claiming that his physical and mental health inhibited the stamina and concentration needed to engage a new business.
c. Mamane paid Arsalen $1450 in January 2003, around the time of the Wrentham auction, which he claimed was for work done by Arsalen in cleaning a warehouse and tagging rugs. More likely these payments were for Arsalen’s work done at the auction. Several attendees of the auction identified Arsalen as a salesman.
d. James Picard, business manager of the American Legion Hall in Northboro, dealt with Mamane and Arsalen regarding the rental of the Legion Hall for a prospective rug sale on March 22-23, 2002.
e. Sergeant Fulcher from the Easton police department testified credibly that, in connection with a district court case involving allegations by the Drorys that Mamane and Arsalen had threatened them, he spoke to Mamane and Arsalen who told him that they were starting a competing rug business together and for that reason the Droiys were making these “baseless” allegations.
Discussion
The amended complaint is in seven counts. Tire essence of plaintiffs claim is that Arsalen breached his Employee Confidentiality and Non-Competition Agreement (the Agreement) with United by going into a competing business with the other defendants and divulging confidential and proprietary information to them. With respect to the other defendants, plaintiff alleges primarily that they misappropriated confidential and proprietary information by planning, organizing, forming and operating a business to directly compete with the plaintiff. Plaintiff seeks injunctive relief only, and attorneys/experts fees and costs on its c. 93A claim.
Defendants counterclaim basically on the allegation that plaintiff fraudulently obtained a temporary restraining order and a preliminary injunction prohibiting them from conducting liquidation rug sales by the use of a forged document, namely Arsalen’s Agreement, and that this constituted a violation of c. 93A and c. 93, §5 (Massachusetts Anti-Trust Act). The defendants waived Count VI, a federal Sherman AntiTrust Act claim, at the beginning of trial.
Paragraph one of Arsalen’s Agreement dated June 19, 2002, provides as follows:
1. Nondisclosure of Company’s Confidential Information
In the course of Employee’s employment with the Company and because of the nature of Employee’s duties and responsibilities, Employee will acquire knowledge of the Company’s confidential and proprietary information not previously known to Employee and not known to the general public. Such confidential and proprietary information includes, but is not limited to, the following: business and financial information, marketing strategies, lists of the Company’s customers and prospective customers and lists of the Company’s vendors and other sources of supply, all hereafter referred to as “Proprietary Information.” Employee will also acquire information respecting Proprietary Information which is generally known to the public, but whose use by the Company or its affiliates is not generally known and which, if the same was known to the Employee prior to employment with the Company, is hereafter also called “Proprietary Information.” Employee agrees that Employee will not, while in the employ of the Company or at anytime thereafter, directly or indirectly, communicate, divulge, disclose or make known, or use for the benefit of Employee or of any other person, firm, association or corporation, any Proprietary Information, whether or not such information is produced by Employee’s own efforts, without the prior written permission of the Company, except that Employee may disclose such matters to the extent disclosure is *423 required (a) in the course of Employee’s employment with the Company to further the interests of the Company or (b) by a court or governmental agency of competent jurisdiction.
Paragraph four of the Agreement provides:
4. Non-competition for Twenty-four Months after Employment
For a period of twenty-four (24) months following the termination of employment with the Company for any reason, Employee agrees that Employee shall not, anywhere in the territoiy consisting of the states of Massachusetts, Rhode Island, Connecticut, New York, and New Jersey and in addition thereto, any territoiy into which the Company extends and carries on its business by expansion of its present activities, engage, directly or indirectly, or be employed by any person, firm, association or corporation engaged in the business of selling rugs by auction or public sale at a temporary location.
Furthermore, paragraph six (a) of the Agreement provides that for one year after the termination of the Employee’s employment, he will not “solicit, induce, attempt to hire, or hire any person employed by the Company within six (6) months prior to such termination, or assist in such hiring by any other person, firm, or association or corporation, or encourage any employee of the Company to terminate his or her employment with the Company.”
A trade secret may consist of any compilation of information which is used in one’s business and which gives him an opportunity to obtain an advantage over competitors who do not know how to use it. Restatement of Torts, §757, Comment b (1939). Trade secrets and confidential information are essentially identical concepts. Jet Spray Cooler, Inc. v. Crompton, 377 Mass. 159, 165 (1979); Chromerics v. Ehrreich, 12 Mass.App.Ct. 1, 10 n.17 (1981). It makes no difference that Arsalen entered into the Agreement in June 2002, after he had been working for two and one half months. See Marine Contractors Co., Inc. v. Burley, 365 Mass. 280, 288 (1974) (enforcing a non-competition agreement executed upon the employee’s termination as necessary to protect the good will of the employer). The Agreement was necessary to protect United’s confidential business information.
I find and rule that information concerning United’s vendors, places of sale, times of sale, prices and mix of rugs, and financial information are confidential and proprietary. Internally, the Droiys treated this information as confidential and proprietary, took reasonable steps to keep it secure, and did not share it with anyone other than those necessary employees. They kept important files in secure locations. They entered into Confidentiality and Non-Compete agreements with other key employees.
Although information such as sale locations might seem public and non-confidential, whether and to what extent a location is profitable is highly confidential. United determined the most propitious sites largely by trial and error over time. It would substantially assist a competitor to know precisely what United knew about the profitability of various locations, and when United had conducted sales/auctions there.
United’s method of promotion is likewise confidential. Although flyers once sent out are widely dispersed and easily available, how many to send out and to what zip codes is proprietary information. Likewise, what “mix” of rugs[2] to include in the sale is proprietary and confidential.
Mamane himself admitted that such things as sales locations, inventory and pricing are confidential and proprietary.
The evidence in this case is overwhelming that the defendants were doing nothing more than precisely copying United’s modus operandi, and that they operated the business utilizing the information furnished to them by Arsalen in violation of his Agreement. That he shared all of his relevant information with Mamane I have no doubt. Furthermore, I infer from the substantial circumstantial evidence that Mamane knew that Arsalen had a confidentiality and non-compete agreement with United. He is quite familiar with such agreements and even has a lawsuit in the Middlesex Superior Court to enforce such an agreement. Mamane’s transparent assertions that he had virtually nothing to do with Arsalen in the rug venture, in the face of overwhelming evidence to the contrary, strongly indicates to me that he knew all along that Arsalen was constrained by a confidentiality/non-compete agreement, and that his affiliation with Arsalen could be the subject of a substantial legal challenge. It is more than a mere coincidence that Allied 1) went to Sam Shamoulian to buy rugs in the same “mix” and for the same price as United; 2) chose locations (towns and facilities) used by United to conduct its sales; and 3) and used the same promotional system used by United, and asked one advertising agency to practically duplicate United’s flyer. That the defendants attempted to hire three of United’s employees is further significant evidence that the information held by United was what Allied was after.
In the Commonwealth non-competition agreements must be reasonable in scope and duration. All Stainless, Inc. v. Colby, 364 Mass. 773 (enforcing two-year restriction). Arsalen’s agreement is for two years and covers the states of Massachusetts, Rhode Island, Connecticut, New York and New Jersey. The states are all covered by United, and Arsalen participated in sales in each of them. Two years is a reasonable duration.
Concerning defendants’ counterclaim, all counts must fail because plaintiff has persuaded me of the main pillars of its lawsuit. Of course, if I were persuaded that United’s claim was based on a forged document, the case would stand on different footing. I am satisfied, however, that Arsalen’s agreement, Exhibit 2 is genuine. Two witnesses (Ronen Droiy, Kim Bevins) testified that they observed Arsalen sign the document. The two handwriting experts who testified, Ms. Nugent for the plaintiff and Mr. Rice for the defendants, reached opposite conclu *424 sions. Rice said Bevins’ and Arsalen’s signatures are forged; Nugent opined that they are genuine. Each expert made a good impression and articulated plausible reasons for his/her opinions. Mr. Rice has somewhat more impressive credentials than Ms. Nugent, having participating in several high profile investigations. Handwriting analysis is, however, imprecise and not guided by uniform, widely accepted objective standards. There is a fair amount of “ipse dixit” in each expert’s testimony. For instance, in concluding that Arsalen’s signature on Exhibit 2 was forged, Mr. Rice points to numerous “stops” of the pen in the final loop that distinguishes Arsalen’s signature. These “stops” are based on wavy lines, or “ink blots,” that appear throughout; yet, as plaintiffs counsel points out, the signature line itself is “wavy.” Thus these features may be nothing more than artifacts of the paper rather than proof of a slowly manufactured, forged, signature. Although both experts were well prepared and helpful in some respects, neither experts’ testimony engenders in me sufficient confidence to base a conclusion. Ultimately, with the humble acknowledgment that historical truth is often difficult to determine, I base my conclusion that exhibit 2 was not forged, either with respect to Bevins’ or Arsalen’s signature, upon Ms. Bevins’ testimony. She is a part-time secretary earning $15,000 per year for United. Her husband, Mr. Isakof, works for United. Potentially these employment relationships might bias her in favor of United, and this could have affected her testimony, but I find it hard to accept that she would come into court and flatly perjure herself, subjecting herself to possible criminal penalties, on a subject which, to a layperson at least, might be determinable by handwriting analysis. If she were willing to take that rather drastic step, it would seem more plausible simply for her to notarize the fictitious signature iri the first place.
On the specific counts of the amended complaint and counterclaim, I find and rule as follows.
Count I (v. Arsalen for breach of contract) — Arsalen breached his Agreement by divulging confidential and proprietary information, competing with plaintiff, and attempting to hire plaintiffs employees.
Count II (v. all defendants; interference with advantageous business relations) — all defendants attempted to interfere with plaintiffs’ employment relationships with Messrs. Panaqua, Gonsalves and Isakof by soliciting violation of Arsalen’s Agreement with United.
Count III (v. all defendants; violation of c. 93A) — All defendants violated c. 93A, §11 by misappropriating plaintiffs’ confidential and proprietary information.
Count IV (v. defendants Mamane and Reed; tortious interference with Contract) — Defendants Mamane and Reed, knowing the defendant Arsalen had an Agreement with United, nonetheless received confidential and proprietary information from him in order to start a competing, mirror-image business, and engaged with Arsalen in an attempt to hire United’s employees in violation of Arsalen’s contract.
Count V (v. all defendants; misappropriation of confidential information) — All defendants misappropriated confidential information from United.
Count VI (v. all defendants; conversion) — Plaintiff has not pressed this theory and I deem it waived.
Count VII (v. all defendants; accounting and imposition of a constructive trust) — plaintiff has not pressed this count and I deem it waived.
Count VIII (v. all defendants; injunctive relief)— plaintiff is entitled to injunctive relief.
Counterclaims
1. Threats: Violation of c. 93A — Defendant have not proved threats and, therefore. I find for plaintiff.
Obtaining tiff was entitled to the temporary relief obtained. I find for plaintiff on those counts.
6. Sherman Anti-Trust Act — waived during trial.
7. Violation of Massachusetts Antitrust Act — For reasons stated, I find for the plaintiff.
Order
Judgment shall enter for the plaintiff enjoining the defendants, and each of them, and any persons or entities acting on their behalf, for a period of tweniyfour (24) months from October 7, 2002 to and including October 6, 2004, fromholding, participating or taking part in rug liquidation sales, by auction or public sale at temporary locations in the states of Massachusetts, Rhode Island, Connecticut, New York, and New Jersey.
Judgment shall enter for the plaintiff on defendants’ counterclaims 1-5 and 7.
Such costs as are allowed by law will be awarded to the plaintiff including reasonable attorneys fees and expert witness fees. Plaintiff may have until April 21, 2003 to file and serve an application for fees and costs and supporting material. Defendants may have until April 28, 2003 to file and serve an opposition.

The court has inherent power and wide discretion to set reasonable limits on the direct and cross-examination of witnesses. Chandler v. FMC Corporation, 35 Mass.App.Ct. 332, 338 (1993); Borges v. Our Lady of the Sea Corp., 935 F.2d 436, 442 (1st Cir. 1991); General Signal Corp. v. MCI Telecommunications Corp., 66 F.3rd 1500, 1507-09 (9th Cir. 1995). Of course time limits must not be arbitrary. Clark v. Clark, 47 Mass.App.Ct. 737, 746 (1999). In setting time limits, I took into account my familiarity with this case from the time of the preliminary injunction hearing to the present, and more particularly my review of the extensive joint pre-trial memorandum filed by counsel prior to trial.

There are a wide variety of oriental and Persian rugs available.