Brady, J.
A former franchisee of Dunkin’ Donuts seeks a declaration that a noncompetition provision in his three franchise agreements is invalid, and damages for unfair competition. I heard evidence, jury-waived, on 5-6 June 2003, and now find and rule as follows.
FINDINGS
1. Plaintiff Craig Boulanger, age 39, began to work in the donut business in the late 1970s. Beginning as a low-level employee for a Dunkin’ Donuts franchise, he eventually became a general manager in charge of several franchises owned by another Dunkin’ Donuts franchisee.
2. In August 1996 he purchased his own franchise from Dunkin’ Donuts in Syracuse, New York. The franchise agreement contained a clause (Section eight) which in substance prohibited him from working for a business selling substantially similar products within 5 miles of any Dunkin’ Donuts location for two years following the termination of his Dunkin’ Donuts franchise agreement. He purchased two additional franchises in March 1999 and October 2000 containing similar clauses. The agreements also prohibited plaintiff from divulging any of Dunkin’ Donuts’ confidential information.
3. In February 2002, plaintiff sold his upstate New York franchises to a Mr. Patel. Thereafter plaintiff, whose heart remained in donuts, had an opportuniiy to become employed by or to own a franchise of Honey Dew Donuts, a competitor of Dunkin’ Donuts. Aware of the post-termination restriction in his franchise agreements with Dunkin Donuts, plaintiff requested defendant to waive the clause. It refused; he sued.
4. Defendant Dunkin’ Donuts, Inc. is a worldwide franchiser of donuts/coffee shops. It is wholly owned by a global corporation by the name of Allied Domecq, PLC. Dunkin’ Donuts’ business is to contract with independent business persons who use the trade names, trademarks, recipes and system developed by Dunkin’ Donuts in operating coffee/donut shops. Dunkin’ Donuts interfaces with the franchisees mainly through business consultants who organize *605 and conduct district meetings several times a year. Dunkin’ Donuts employs a system to rate franchisees as A, B, or C. If a franchisee is performing at an A level, Dunkin’ Donuts will encourage the franchisee to enter into a territorial development program with it whereby the franchisee is expected to locate and develop potentially favorable sites for additional franchised stores, and Dunkiri Donuts will hold the territory “exclusive” to the franchisee. Plaintiff was engaged in such a program with Dunkiri Donuts when, in early 2002, he and his partner decided to sell their three franchises, grossing $1,040,000 from the sale.
5. From the outset of its relationship with franchisees, Dunkin’ Donuts is assiduous about informing the franchisee that it will become privy to proprietary/confidential information and that it will be obliged to hold that information in confidence. For instance, the Uniform Franchise Offering Circular, the detailed document required by law to be furnished to prospective franchisees, describes proprietary information in the Offering Guide, and the noncompetition provisions which the franchisee will be required to comply with during and after the term of the franchise. The franchise agreement itself contains numerous references to and provisions concerning proprietary and confidential information. Likewise, the Development Program Deposit Agreement refers to proprietary and confidential information which the franchisee will become privy to. At least one of the numerous manuals delivered to franchisees which describes in substantial detail the Dunkin’ Donuts system comes with a cover letter advising that the information contained in the manuals is confidential and that the franchisee shall use all reasonable efforts to maintain such information as secret and confidential. Finally, when a franchisee sells a store, he acknowledges possession of Dunkin’ Donuts’ confidential and proprietary information and that he will be selling that confidential information to the purchaser. Thus, plaintiff here signed numerous documents by which he acknowledged the proprietary and confidential nature of the information which he was acquiring and/or selling.
6. The district meetings, held several times a year, often involve the dissemination of confidential information such as financial data and profitability of particular stores, new product development, and marketing/promotion strategy. Some parts of these meetings are open only to franchise owners, and other aspects which deal more with operational details are open to general managers, managers, and other lower-level employees.
7. Virtually all Dunkiri Donuts employees are subject to a Code of Ethics or Code of Conduct which, among other things, requires them to hold the company’s proprietary information in confidence. Dunkin’ Donuts employees, however, are not required to sign noncompetition agreements.
8.Dunkiri Donuts is not alone in the industry in requiring franchisees to sign confidentiality and non-competition agreements. Honey Dew Donuts, a competitor, has similar provisions in its standard franchise agreement, although it imposes a 1-year, 3-mile radius for noncompetition rather than defendant’s 2-year, 5-mile radius. Plaintiff was evidently willing to sign such an agreement were he declared free to deal with Honey Dew.
DISCUSSION
Massachusetts law enforces covenants not to compete, so long as they are not unreasonable in time and space, and necessary to enforce a legitimate business interest of the employer. Analogic Corp. v. Data Translation, Inc., 371 Mass. 643, 647 (1976). Legitimate business interests include the protection of trade secrets, confidential information, and goodwill. New England Canteen Service, Inc. v. Ashley, 372 Mass. 671, 674 (1977). In this case plaintiff seeks to invalidate a 2-year, 5-mile territorial restriction, arguing primarily that Dunkin’ Donuts does not possess trade secrets or confidential information which it is legitimate to protect, and that instead it is attempting to stifle legitimate competition. I disagree. Section eight of the franchise agreements signed by the plaintiff is valid and enforceable.
Trade secrets and confidential information may be treated as one category for this case. Chomerics, Inc. v. Ehrreich, 12 Mass.App.Ct. 1, 10, n.17 (1981). The information owned by Dunkiri Donuts which is proprietary/confidential includes the operating manuals and information therein, and similar information contained in videos, CD-ROMs, and web sites; the recipes for coffee and baked goods; financial information and data; marketing and promotion strategy; new product development; and location of sites for new stores and building plans relating thereto. Typically such information is regarded as confidential and protectable by agreement. There are general factors which the courts will look to in determining whether or not specific information is proprietary/confidential and thus protectable. Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972). When an express agreement is involved, so long as the restrictions do not surpass the bounds of reasonableness, there is no reason to take a narrow view of what is confidential. Dunkin’ Donuts has taken steps to protect its confidential information, through written notice to and agreements with franchisees, appropriately limiting attendees at business meetings, and a code of ethics/conduct for all employees. It has spent enormous sums of money (estimated at $1 billion) to develop its distinctive system. There was no evidence introduced that others in the industry are privy to information possessed by Dunkiri Donuts. To be sure, as plaintiff points out, Dunkiri Donuts executives have access to the same or similar information, yet they are not subject to noncompetition clauses; but the fact that a company has not done all *606 that it possibly could have done to guard the secrecy of the information is not necessarily fatal to its defense of the restrictive clauses.
Here the plaintiff, a longtime employee in the Dunkin’ Donuts system, entered into the three franchise agreements with his eyes wide open. He was represented by counsel. He has acquired a substantial amount of information that is confidential/propri-etaiy. He profited from his relationship with Dunkin’ Donuts. Should plaintiff join a competitor within two years of the termination of his franchises, it is unlikely that he could set aside and not use that information to benefit himself or his employer to the detriment of Dunkin’ Donuts and other franchisees within the 5-mile radius who, as parties to identical restrictions, have a right to expect Dunkin’ Donuts equitably to enforce the restrictions. See Marcam v. Orchard, 885 F.Sup. 284 (D.Ma. 1995). Concluding thus that the section eight noncompetition restrictions are valid and enforceable, there is nothing left of the other two counts. Dunkin’ Donuts acted fairly and within its rights in advising plaintiff, when he asked, that it would enforce its rights under the franchise agreements.
ORDER FOR JUDGMENT
A declaratoiy judgment shall issue stating that the section eight post-termination restrictive covenants are valid and enforceable. Judgment shall enter for defendant on the remaining counts II and III. Such costs as are allowed by law shall be awarded to the defendant.